A. M. ENFIELD, Administrator, Appellee, v. CHARLES O. BUTLER, et al., Appellants.

No. 42974.

DECEMBER 17, 1935.

REHEARING DENIED JUNE 20, 1936.

Huebner & Huebner, for appellants.

Pike, Sias, Zimmerman & Butler, John S. Tuthill, and W. E. Wallace, for appellee.

HAMILTON, J.—The accident or collision out of which this action arose occurred on the evening of October 29, 1933, some time between 11 o'clock p. m. and midnight, at a point where Iowa primary highway No. 149 intersects United States primary highway No. 6. For a better understanding of the situation surrounding the scene of this accident we attach a plat or survey, being that portion of Exhibit K introduced in evidence, showing the intersection of the two highways and the point where the accident occurred. The starting point for all measurements on this plat is the yellow mark opposite the stop sign on No. 149.

"SLOW" SIGN 1622' WEST ON No. 6

893'

808'

665'

SERVICE STATION

No. 6

36.5'

"STOP" SIGN

YELLOW MARK ON PAVEMENT

N

HIGHWAYS No. 6 AND No. 149
IOWA COUNTY

No. 149

WAF

No.6

CRUSHED ROCK

"STOP" SIGN

YELLOW MARK ON PAVEMENT

52'

18'

31.6'

6

18'

36.8'

31.5'

28.5'

24.8'

22.2'

20.1'

18'

YELLOW MARK ON PAVEMENT

"STOP" SIGN

149

Iowa primary highway No. 6 is also United States Highway No. 6 and runs east and west through Iowa county, and travel over this highway is given preference over travel coming in on intersecting roads. Highway No. 6 is intersected from the south by primary highway No. 149. Both highways are paved. As No. 149 comes from the south, it divides, forming a Y, and each arm of this Y intersects No. 6 with a long, gradual, sweeping curve. In the record, the west arm of the Y is referred to as the "westerly intersection" and the east arm of the Y as the "easterly intersection". The width of the paving on both roads is 18 feet. At the point where the easterly intersection of No. 149 joins with No. 6 there is a stop sign to the right, and a yellow line about 18 inches wide and 8 feet 8 inches long running diagonally across the right half of No. 149, and at this point the paving from curb to curb is 28.5 feet wide. There is solid paving west of this yellow line, uniting the two highways for a distance of 52 feet, and at this point 52 feet west of the yellow line the width of the paving is 36.8 feet, and on west of this for some 53 feet the ground between the two pavings is covered with crushed rock.

Charles O. Butler is unmarried, is 25 years old, and resides with his father and codefendant, James T. Butler, in Kansas City, Missouri. The Butlers formerly lived at Mechanicsville, Iowa, but moved to Missouri about 3 years ago. On the night of the fatal accident, Charles O. Butler was driving his father's new Oldsmobile Eight. It had been driven about 7,000 miles. A party of four, consisting of Butler and a girl friend in the front seat, and H. F. Gibeaut of Mechanicsville, Iowa, a real estate dealer, and a Mrs. Riorden, of Cedar Rapids, Iowa, who rode in the back seat, left Cedar Rapids in the evening and drove to Montezuma, where they left Mr. Butler's friend, Miss Getchel. The other three were proceeding back to Cedar Rapids via United States highway No. 6 when the accident occurred.

Miss Helen Rebecca Enfield was 24 years old, was living in Waterloo with her parents, and had been teaching school in Williamsburg for three years. She owned a Plymouth car. Earl O'Neil, an acquaintance of Miss Enfield, is a young unmarried man, 29 years old, and lives at Williamsburg and is the manager of an oil station. About 8:30 p. m. on the evening of the accident, O'Neil and Miss Enfield motored to Iowa City, taking Miss Enfield's car. O'Neil did the driving. As they

were returning home over highway No. 6, approaching the easterly intersection of No. 149, and had reached a point, according to O'Neil, about 150 feet east of the intersection, he saw the lights from defendant's car. At that time defendant's car was opposite the service station 665 feet west of the scene of the accident. O'Neil was well acquainted with the location of the intersecting highways and this filling station and the distances necessary to be traveled from where his car was, and from the point at which he saw defendant's car, to the easterly intersection of No. 149. As you approach the easterly intersection on No. 6, from a point 150 feet east, the road curves to the left on an angle of about five degrees, and from the intersection on south the curve is more marked, or about ten degrees. O'Neil testified that, when he was at this point 150 feet east of the yellow stop mark and saw the defendants' car some 665 feet away, he believed it was coming toward him at a reasonable rate of speed and that he had plenty of time to make the turn and be off No. 6 and on his way on No. 149. He had both hands on the steering wheel. Miss Enfield was sitting by his side. Up to this point they had been talking. Nothing was said as they drove this 150 feet. The record does not show that Miss Enfield said or did anything. From this point 150 feet east, they proceeded on the right-hand side of the black mark in the center of the pavement for a distance of 25 or 30 feet, when he drove to the left of the black line and proceeded on to the intersection. As he rounded this slight curve to the left into the easterly intersection of No. 149, the left wheels of the car were about 18 inches from the south curb and he was engaged in driving his car and making observations to the east and south and did not look to the west again until he was about the yellow mark on No. 149, when he saw defendant's car coming directly at him off the south line of No. 6, and, when the front of his car was beyond the yellow line 18 or 20 feet, the collision occurred. He said that just before the impact defendant's car suddenly veered to the northeast.

According to Butler's story, as he came to the slow sign west of the westerly intersection of No. 149 with No. 6, he slowed down to 35 miles per hour, and after passing this arm of the Y, he increased his speed to 45 miles per hour. (Gibeaut estimated the speed at 50.) He knew nothing of the easterly intersection, and, when he saw the lights of the car coming from the east, the

idea that it was attempting to negotiate a turn on to No. 149 never entered his head. He thought he had passed the intersection when he got by the west arm of No. 149. From there on until after the accident occurred he thought he was facing a car on an open road. He says: "It appeared to me they were traveling west on the wrong side of No. 6 and I wasn't able to observe that they were trying to make a left hand turn on to No. 149." Gibeaut knew nothing of this easterly intersection and did not see it, and there are no road signs other than the slow sign west of the westerly intersection to call attention to the easterly intersection.

The jury could readily find from the evidence that there was ample room on the left to pass the Plymouth car in safety, had the defendant had his car under control and not overlooked the fact that there was an intersection and widening of the pavement. Having failed to observe this, it is fair to assume that he was attempting to keep to the right and followed the right line of the pavement which broadens into an intersection, and in doing this got over onto the intersection and ran into the other car, thinking all the time he was still on No. 6, when, as a matter of fact, in keeping to the extreme right of the pavement as it widened out for this easterly intersection, he had unconsciously driven entirely off the 18 feet constituting No. 6. This theory dovetails into O'Neil's account of the way the accident occurred, except he says the Butler car left the pavement entirely. The south line of the paving on No. 6 as you approach this easterly intersection from the west angles to the right toward the yellow mark at an angle of about seven degrees, so that one not acquainted with the road, driving in the nighttime with lights of another car facing him, could easily be fooled. By applying a straight edge to the lines on the plat it can be readily ascertained that defendant would have to swerve his car to the right very slightly to catch the front corner of the Plymouth car after it had just cleared the yellow stop mark, as claimed by O'Neil, the driver of the Plymouth car.

The attendants at the filling station, located 665 feet west of the point of the accident, heard and saw defendant's car. One of the attendants was inside preparing to retire for the night. He said he could hear the roar of defendant's car and that it "put him on needles"; that he could hear the roar of the engine above the noise of the car, indicating it was traveling at a rapid

rate. The other attendant was outside, locking the gas pumps, and gave it as his judgment that defendant's car as it passed the station was traveling 70 miles an hour. He watched it until the collision took place, and, so far as he could observe, it never slowed down. Just before the impact, he saw the lights from the Plymouth car as it made the turn swing off up the hill on No. 149, which corroborates O'Neil's version. There is also evidence of two or three witnesses for the plaintiff who appeared on the scene of the accident before the cars were moved, and who made observations and measurements by stepping off the distances that night, all of which corroborates O'Neil's story. The defendant says that just before he struck the other car he "socked down" hard on his brakes. These three witnesses who were there soon after the accident testified to their observations of broken glass on the pavement, and discolored water, similar to that from a radiator, and some burnt tire marks, tending to corroborate the testimony of O'Neil as to the point of the collision.

There is a sharp conflict in the testimony as to the exact point at which the collision or impact took place. The evidence of the plaintiff is to the effect that the collision occurred after the car driven by O'Neil had cleared highway No. 6 and was entirely over on highway No. 149. O'Neil testified that the front wheels of the Plymouth car he was driving were 18 or 20 feet over and beyond and west and south of the yellow line, while the testimony of defendant and his witnesses indicates that the collision occurred some 25 to 30 or 40 feet east of the yellow line. There are physical facts tending to support both theories. If, as plaintiff's witnesses testify, the defendant had proceeded on east on highway No. 6, instead of pulling his car to the right as he approached the Plymouth car, the accident would not have happened. Likewise, if the Plymouth car was only 150 feet from the intersection at the time the defendant's car was over 600 feet west, had defendant driven his car at a reasonable rate of speed as provided by law in traversing the intersection, the accident would not have happened. If O'Neil's version is true as to the distance defendant's car was away from him, it would be necessary for defendant to drive at a terrific rate of speed to reach the point of the collision. The evidence shows that this Oldsmobile Eight is capable of 85 miles per hour. If plain-

tiff's version is true, the results indicate that defendant's car struck the Enfield car while traveling at a high rate of speed.

There is likewise a wide discrepancy as to the location of the cars immediately after the accident. Plaintiff's witnesses claim that the Plymouth car was east of the yellow mark, about 25 feet, headed west and clear out on the shoulder about 2 feet from the south curb of the paving, and that the Oldsmobile was headed in a southwesterly direction, with the back end toward the north, out on the pavement, and that some of the witnesses moved the back end around so as to make room for cars passing on No. 6. Defendant's witnesses claim that the cars came to rest 35 or 40 feet east of the yellow mark, and that the front ends of the cars were about even. The witnesses for the plaintiff in the main made their observations that evening and were in a position to give more accurate information than were most of the defendant's witnesses.

The record is quite voluminous, the appellants' brief and argument containing 180 pages, involving a thorough and wide research of the authorities bearing upon the legal propositions involved, and it would be impossible to take up the numerous assignments of error in rotation and attempt to dispose of each of them separately.

█▌█ One of the points to which the greater part of appellants' argument is directed deals with the question of contributory negligence on the part of the occupants of the Plymouth car. Counsel for appellants very strenuously contend that there can be no recovery in this case because the plaintiff has failed to show that the deceased, Miss Enfield, and her driver, O'Neil, were free from contributory negligence, and that the court erred in not sustaining the defendants' motion to direct a verdict. With this contention of appellants we are unable to agree. The general rule as laid down by our decisions is that, "except in cases where the facts are clear and undisputed, and the cause and effect so apparent to every candid mind that but one conclusion may fairly be drawn, the question of contributory negligence is for the jury." Carlson v. Meusberger, 200 Iowa 65, 72, 204 N. W. 432, 435. There being a direct conflict as to the point of the accident, the question of contributory negligence in this case under the facts is necessarily one for the jury, for it is manifest that, before the court could sustain a motion to direct a verdict for the defendants, it would have to find as a

matter of law that the accident occurred while the deceased's car was still on highway No. 6, whereas in this case there is a direct conflict in the evidence on this point.

The facts in this case bring it squarely within the rule announced in Wambeam v. Hayes, 205 Iowa 1394, 1399, 219 N. W. 813, 816, wherein this court said:

"If plaintiff's car had reached the easterly side of the north and south road, where it rightfully belonged, when he was struck by the defendant's car, his negligence, if any there was, by failing to pass beyond and to the right of the intersection, did not contribute to his injury."

And in this case, if the car of the deceased, driven by O'Neil, was entirely over the yellow line on to highway No. 149, then the negligence of O'Neil or Miss Enfield in making the turn from one pavement to the other was not and could not be the proximate cause of the injury and resulting damage.

The appellants' contention that the physical facts as to the location of the cars after the accident and the manner in which they were damaged show conclusively that the deceased's car could not have been at the point claimed by appellee at the time of the collision is not well founded. The condition and appearance of the cars after the collision shows very clearly that it was not a straight head-on collision, but that defendant's car must have struck the other car at an angle.

All these matters are matters for the jury to determine, as it is impossible to tell with any degree of accuracy exactly where a car will stop or in what particular direction it will face after a collision with another car. At least, there is no such certainty under the facts and circumstances in this case as to bring it within the physical fact rule announced in the case of McGlade v. City of Waterloo, 178 Iowa 11, 156 N. W. 680. Without narrating the facts, it is sufficient to say that there was such a dispute with reference to all these matters as to make it a question for the jury to determine. This being true, the rules of law with reference to contributory negligence contended for by appellants and laid down in railroad and street car crossing cases have no application. In all of those cases the accident occurred on the track of the railroad or street car company, and, because the persons injured did not keep a lookout or show freedom from contributory negligence, they were

not permitted to recover. There was no dispute as to where the accident happened in those cases. They would have application here if it were conceded that this accident happened on the pavement of highway No. 6, but the verdict of the jury indicates that they found that it happened on highway No. 149, and there is quite abundant evidence to support such a finding. One cannot read this record without coming unhesitatingly to the conclusion that this is just another case of excessive speed, which resulted in frightfully wounding and bruising the body of this promising young woman, causing numerous fractures in both lower limbs and feet, and a gaping puncture of the tissues of her brain, leaving her unconscious, her body cold and clammy, from which horrible wounds and shock she never regained consciousness, but died the following day.

Appellants criticize and assign as error the giving of 21 out of the total 27 instructions given by the court. We have read the instructions very carefully in the light of the able arguments of counsel, and find that the complaints are generally without substantial foundation, and it would be useless to discuss them in detail. We find nothing in the instructions that could have misled or confused the jury. We will notice a few of these complaints.

■■■ One of the grounds of negligence charged was that defendant carelessly and negligently approached and traversed the crossing or intersection of said highway No. 6 and highway No. 149 without having the Oldsmobile car under control and without reducing the speed to a reasonable and proper rate, in violation of section 5031 of the Code of 1931. In instruction No. 12, the court told the jury that it is the law of this state as set forth in section 5031 of the Code that any person operating a motor vehicle shall have the same under control and shall reduce the speed to a reasonable and proper rate when approaching or traversing a crossing or intersection of public highways. Instruction No. 21 is in the following language:

"In connection with the intersection of Highway No. 6 and highway No. 149 involved in this case, you are instructed that such intersection of highway No. 149 with highway No. 6 commences on the west on highway No. 6 at the west edge of the west approach of primary No. 149 where the cement paving starts to widen in excess of 18 feet for such west approach and

extends from such point to the east of the east approach of highway No. 149 connecting with highway No. 6 to a point where the pavement east of said east approach of highway No. 149 comes to its normal width of 18 feet. The normal width of each of said highways being 18 feet.''

Appellants except to the giving of instruction No. 21 and assign the giving of the same as error on the following grounds: (1) That the definition is erroneous and not in accordance with paragraph 15 of Code section 4863. (2) Said instruction erroneously fails to confine the intersection to the area that is common to said highways; that the area between the westerly and easterly intersections of highways No. 6 and No. 149 is not common to, does not touch or intersect, and is no part of, the intersection. It is appellants' contention that when a highway is split by a Y, one branch thereof intersects at one point and another branch at another point, and that two separate and distinct intersections are formed. Code section 4863, says: '' 'Intersecting highway' shall mean any highway which joins another at any angle, whether or not it crosses the other,'' and appellants argue that it is the joining of one highway with another that makes them intersecting highways, and that No. 149 joins No. 6 only at said easterly and westerly intersections, which are 893 feet apart and does not join No. 6 between said easterly and westerly intersections.

In considering instruction No. 21, given by the court in defining the meaning of the area of the intersection of these two highways, the object and purpose in the giving of such instruction should be borne in mind. The only purpose for which it could have been given in this case was to enable the jury to apply the rule laid down by instruction No. 12, in determining what was the reasonable and proper rate of speed for a motor vehicle to travel when approaching and traversing an intersection, and for the purpose for which it was given we think the definition of the court as contained in instruction No. 21 was correct. The matter is not clearly defined by statute or by our decisions. Reference is made to the matter in the case of Wambeam v. Hayes, 205 Iowa 1394, 219 N. W. 813, in an opinion by Justice Albert, wherein the court said:

''If on a retrial of the case it should become necessary to submit the question as to the location of the intersection of

these roads, it is, in its final analysis, a question for the jury under the instructions of the court," citing 1 Blashfield's Cyc. of Automobile Law, 464; Hensen v. Connecticut Co., 98 Conn. 71, 118 A. 464; Bartlett v. Hammond, 76 Colo. 171, 230 P. 109; Fournier v. Zinn, 257 Mass. 575, 154 N. E. 268.

The evidence shows that there is a sign on the south side of highway No. 6, just west of the westerly intersection of No. 149, bearing the words, "Slow, Arterial Highway". There is a like sign on the north side of No. 6 east of the easterly intersection of No. 149, and there is no such sign in between the two arms of the Y or the easterly and westerly intersections of No. 149. Manifestly, the highway commission, for the purpose of regulating the speed and requiring the operator of a vehicle to slow down and have his car under control in approaching and traversing a crossing or intersection, intended to include the entire distance between the easterly and westerly intersections of No. 149 with No. 6. The location of these signs is the only evidence in the case bearing on this question. We think the court's instruction is in accordance with the facts as shown by the evidence, and, as applied to the facts in this case, it is a correct statement of the law.

■■■ Appellants also assign as error the court's failure to give an instruction embodying the law of the road as contained in sections 5020, 5033, and 5035. It is appellee's contention that none of these provisions are applicable to any situation presented by the facts in this case. It is self-evident that all three of these sections could not apply to the same set of facts. Section 5020 is intended to apply to cars going in opposite directions on the same highway in passing, just as section 5021 applies when a car overtakes another going in the same direction. In approaching a car, one must turn to the right, and in overtaking a car he must turn to the left in passing. Section 5020 has no application here. See Buzick v. Todman, 179 Iowa 1019, 1022, 162 N. W. 259; Wagner v. Kloster, 188 Iowa 174, 182, 175 N. W. 840. Section 5035 is intended to control traffic at intersections of streets or highways when cars approach each other at an angle, the one approaching from the right has the right of way, and, so far as applicable, this section was embodied in the court's instruction No. 9, hereinafter set out.

■■■ Section 5033 is intended to prevent the cutting of

corners at intersections and would be applicable if defendant's car had been approaching from the south on highway No. 149. In such a case, under this section the law would require another car turning from No. 6 on to No. 149 to pass beyond the center of the intersection of the two streets before making the turn. There being no car approaching on No. 149, this section does not apply.

■■■ Section 5032 is to control the movements of a car at any point in the street or highway, requiring the operator of a motor vehicle, before stopping, turning, or changing his course, to ascertain and see that he can make the stop, turn or change in his course in safety, and this is the statute that is embodied in the court's instruction No. 9, as applied to the movements of the Enfield car, and the one applicable to the situation in this case. The court's instruction on this matter, after setting out the substance of the statute, is in the following language:

"The duty imposed upon the driver of an automobile under the foregoing law requires the driver to see that there was sufficient space in which to make the movement in safety. This duty not only requires a driver to see that there is sufficient space to make the turn in safety, but also requires the driver to slacken the speed of his car *to allow the approaching car to pass* if there is not sufficient space within which to make the turn"; the instruction further providing that, if the jury finds that the driver of the Plymouth car violated the above law and the duty therein required of him, and the jury further finds that his violation contributed in any way or any degree directly to the damages, the plaintiff cannot recover.

In connection with the above instruction the court gave instruction No. 10 as follows:

"In connection with the last above instruction you are further instructed, however, that if Earl O'Neil, as he approached the intersection of the east approach of public highway No. 149 with highway No. 6 at the time of the collision in this case, saw the Oldsmobile operated by defendant, Charles O. Butler, approaching at such a distance from said east approach of said intersection, and that, acting as a reasonably cautious and prudent person would act, he believed and had a right to believe, that he could make the turn into highway No. 149, and clear the intersection in safety ahead of the approaching Oldsmobile, he could not be guilty of negligence in undertaking to do so."

We are of the opinion that the court correctly presented the law of the case to the jury. Furthermore, the failure to incorporate section 5033 in the court's instructions would, under the facts in this case, if error, be error without prejudice.

 In view of the verdict returned by the jury, it must have found that the collision took place in accordance with plaintiff's contention, beyond the intersection and over on highway No. 149. This being true, any act of negligence of the owner of the car or the driver of the Plymouth car in making the turn from No. 6 on to No. 149 would not and could not be the proximate cause of the injury.

 The appellants likewise assign as error the giving of instruction No. 10, in that it assumes that O'Neil actually saw the defendant's car approaching at such distance from said east approach to said intersection that, acting as a reasonably cautious and prudent person, he could believe, and had a right to believe, that he could make the turn on to highway No. 149 and clear the intersection in safety ahead of the Oldsmobile, when the uncontradicted record shows that O'Neil did not look at any time after he passed a point 150 feet east of said intersection until just as the impact occurred. The testimony does show that O'Neil saw the car at this point 150 feet east of the intersection and that he knew the distance both cars would have to travel, and that he believed the Oldsmobile was traveling at a reasonable rate of speed, and that he believed that he had time to safely make the turn and get over on to No. 149 ahead of the defendant's car. Appellants contend, however, that his belief is not one of the excuses set out in Kisling v. Thierman, 214 Iowa 911, 916, 243 N. W. 552, and that it did not make any difference what he believed, this should not excuse him for his violation of Code section 5032, and that, if O'Neil was cutting the corner, the path of his car was unlawful and he had no right to pass ahead of the Butler car, even though he believed, and had a right to believe, that he could thus make the turn on to No. 149 and clear the intersection in safety ahead of the Oldsmobile, and appellants cite 42 C. J. p. 992. As we read Paragraph 717, page 992 of 42 C. J., it supports the court's instruction. It is there provided:

"However, the driver who desires to make a left turn is not under an obligation to await the passage through the inter-

section of a car approaching from the opposite direction regardless of relative distances and speed, but if he reaches the intersection in such time that it is reasonably apparent that he can safely make his turn before the other car reaches the intersection he may proceed to do so.''

Any other rule would be absurd.

In making application of the provisions of section 5032 of the Code, the operator of a motor vehicle is entitled to have his actions measured by what the jury finds an ordinarily cautious and prudent man would do, or would be justified in doing, under like or similar circumstances. Also he has a right to assume that the operator of the other car will obey the law as contained in section 5031, in approaching and traversing a crossing or intersection, that he will slow down and reduce his speed to a reasonable rate. Kadlec v. Al. Johnson Const. Co., 217 Iowa 299, 304, 252 N. W. 103, and cases therein cited.

Appellants also complain and cite as error the failure of the court, in setting forth the provisions of the law as applicable to the acts of the defendant, to designate the legal excuses referred to in the Kisling case, supra. The defendants offered no evidence of a legal excuse. Instructions must have some basis in the evidence to support the same. Otherwise it is error to give such instructions. Deweese v. Iowa Transit Lines, 218 Iowa 1327, 256 N. W. 428.

Another one of the appellants' primary objections, of which they invite our earnest consideration, is the giving by the court of an instruction that it was established as a matter of law that James T. Butler was the owner of the said Oldsmobile Eight, and that such ownership made out prima facie that said automobile was then and there operated with the consent of the owner. In other words, that an inference arises from the proof of ownership that the car that is being operated upon a highway is being operated for or in behalf of the owner, which inference must prevail unless there is a showing to the contrary. As to the latter proposition, it is in accord with the rule laid down in Lange v. Bedell, 203 Iowa 1194, at page 1196, 212 N. W. 354, 355, wherein this court said:

''As appellant was the owner of the automobile, it must be assumed that he exercised the ordinary control and incidents of ownership thereover. Presumptively, therefore, as it was in

the possession of Leslie, it was being driven with the owner's consent. Landry v. Oversen, 187 Iowa 284, 174 N. W. 255; Rowland v. Spalti, 196 Iowa 208, 194 N. W. 90; Seleine v. Wisner, 200 Iowa 1389, 206 N. W. 130; Halfpap v. Gruis, 199 Iowa 757, 202 N. W. 592; Napier v. Patterson, 198 Iowa 257, 196 N. W. 73.''

It is the contention of plaintiff-appellee that the question of ownership of this car must be determined by the law of the domicile of the owner. Justice Story of the United States Supreme Court, as early as 1845, announced the universal rule as to personal property to be that ''the law of the owner's domicile is to determine the validity of the transfer or alienation thereof, unless there is some positive or customary law of the country where it is found to the contrary.'' Black v. Zacharie & Co., 3 How. 483, 514, 11 L. Ed. 690, 704. Justice Cole, in the case of McDaniel v. Railway Co., 24 Iowa, 412, Div. 2, announced the rule to be that, if a contract is void or illegal by the law of the place where made, it is held void and illegal everywhere. See, also, Miller v. Ins. Co., 117 Kans. 240, 230 P. 1030, 38 A. L. R. 1113; 5 R. C. L. 934, 949. The statutes of another state will in comity be enforced, if not against the policy of the law of the forum. Johnson v. Railway Co., 91 Iowa 248, 59 N. W. 66. In such cases, the law of the place where the right was acquired or liability incurred will govern as to the right of action, while all that pertains merely to the remedy will be controlled by the law of the state where the action is brought. Johnson v. Railway Co., supra.

Under the statutory laws of Missouri, which were introduced in evidence in this case without objection, it is made mandatory that the owner of an automobile register the *ownership* thereof in the office of the secretary of state, who issues a certificate of ownership, and which certificate is preserved as a permanent record. And under the title ''Application of Law'' it is provided: ''This article shall be *exclusively* controlling on the registration, regulation, operation, *ownership and sale* of motor vehicles,'' etc. Mo. St. Ann. section 7758, p. 5178. Upon the transfer of ownership, the certificate of registration and the right to use the number plates shall expire. No certificate of registration or number plate shall be issued unless the applicant therefor on application is granted a certificate of

ownership. These applications must be made on blanks furnished, and must contain a statement of the applicant's source of title. The commissioner of the motor vehicles department shall make investigation, and, if satisfied the applicant is the lawful owner, shall issue the certificate of registration. This certificate is good for the life of the car so long as the same is owned or held by the original holder of the certificate, and shall not have to be renewed annually, and it is made unlawful for any person to operate in that state a motor vehicle registered under the provisions of the law unless a certificate of ownership shall have been issued as therein provided. In the event of sale or *transfer of ownership* (which would include a gift), the holder of the *certificate of ownership shall indorse on the same* an assignment thereof, with warranty of title in the form printed thereon, and deliver the same to the buyer. The buyer shall then present said certificate, assigned as aforesaid, to the commissioner with his application for registration, whereupon a new certificate shall be issued to the buyer, and *the sale without the assignment of such certificate of ownership shall be fraudulent and void.*

Penalties are provided for false statements and violations of the provisions of the statute. Section 7758 et seq., Revised Statutes of Missouri 1929 (Mo. St. Ann. section 7758 et seq., p. 5178 et seq.). This statute has been construed by the Supreme Court of Missouri and held to be mandatory, and no other proof of ownership, sale, or transfer is recognized by that tribunal. State ex rel. Connecticut Fire Ins. Co. v. Cox et al., Judges of the Springfield Court of Appeals, 306 Mo. 537, 268 S. W. 87, 91, 37 A. L. R. 1456. This certificate of ownership is held to be a muniment of title, perpetuated by the commissioner as a public record, which can be referred to in tracing crime and collecting revenue due the state, and any transfer in any other manner is held to be fraudulent and void.

The state of Michigan has a similar statute, and in passing on the law in the case of Endres v. Mara-Rickenbacker Co., 243 Mich. 5, 219 N. W. 719, 720, the law was upheld. In this Michigan case the defendant was a dealer in secondhand automobiles and acquired an automobile registered in the state of Ohio. The defendant dealer sold the same to one Pushkin, a resident of Michigan, who paid for it and accepted delivery. Pending receipt of certificate of title and registration in Michigan, to

the end that Pushkin might use the car, the defendant dealer loaned him a set of license plates which were put on the car, and, while Pushkin was driving the car, having on it these license plates of the dealer, it collided with plaintiff's car, to plaintiff's damage. The court said:

"The decisive question is, which of the defendants owned the car? Is the sale void for the dealer's violation of the statute (section 3, Act 16, Public Acts of 1923), in failing to deliver to Pushkin 'an affidavit of conveyance or assignment in such form as the secretary of state shall prescribe, to which shall be attached the assigned certificate of title received by such dealer'?"

In upholding this law the court said:

"The general rule is well settled that, where statutes enacted to protect the public against fraud or imposition, or to safeguard the public health or morals, contain a prohibition and impose a penalty, all contracts in violation thereof are void."

The court concluded by saying:

"In view of the purpose and language of the statute, we think it was the intent of the legislature that a sale or transfer of an automobile in violation of the provisions of the act should be void. It follows that in the case at bar there was not a sale to Pushkin, that as between him and the dealer, the dealer was the owner of the car (which ownership on this record the dealer may not question), that it was being driven with consent of the dealer at the time of the accident, and that it is liable."

See, also, briefs in 37 A. L. R. 1465, 52 A. L. R. 701, and 63 A. L. R. 688, wherein it will be found that a number of other states in the union have similar laws and all of them are strictly construed.

It is undisputed in the record that James T. Butler made application and had registered in his name the Oldsmobile Eight in the office of the secretary of state of the state of Missouri, and the secretary of state issued to him a certificate of ownership. The application for the registration is signed by James T. Butler, and therein he represented to the secretary of state that he purchased said car from the King Motor Company of

Kansas City, Missouri, on August 7, 1933. The defendants attempted to show that James T. Butler about the first of April, 1933, owned a Chevrolet car registered under the laws of Missouri in James T. Butler's name as owner; that he gave to his son, Charles O. Butler, this Chevrolet, and that along in April or May, 1933, Charles O. Butler traded this car to the King Motor Company for an Oldsmobile Six, and later, in August, 1933, Charles O. Butler traded this Oldsmobile Six to the King Motor Company of Kansas City, Missouri, for the Oldsmobile Eight involved in this case; that he had the ownership of the Oldsmobile Eight registered in his father's name, so that the tags or license plates from the Chevrolet could be transferred to this Oldsmobile Eight, to avoid buying new license plates. This evidence all went in over the objections of the plaintiff, and later, on plaintiff's motion, all the evidence with reference to the transactions of Charles O. Butler with the King Motor Company was stricken from the record, and the court determined as a matter of law that James T. Butler was the owner of the Oldsmobile Eight, involved in this case, and defendants assign this as error. The ruling of the court was correct. The transaction between the father and son, in order to be valid, must comply with the laws of the state where the property was situated and where they resided, and there was no attempt to comply with the provisions of the statute, and hence the court was right in striking the testimony with reference to the transfer from the father to the son. In the language of Justice Sherwood of the Missouri court:

"The law will not stultify itself by promoting on the one hand what it prohibits on the other, and will for this reason leave the parties to this suit where it finds them, unsanctioned by its favor and unaided by its process." State ex rel. Connecticut Fire Ins. Co. v. Cox et al., Judges of the Springfield Court of Appeals, supra.

Was the car being driven with the consent of James T. Butler? The appellants contend that there was no evidence upon which to submit this question to the jury. James T. Butler on cross-examination testified:

"I knew that this Oldsmobile 8 automobile that was involved in this collision was registered in my name in the state of Missouri.

"Q. You knew under the Missouri law before numbers could be transferred from one car to another that the title to the car to which it was transferred had to be registered in the State of Missouri, didn't you? A. Yes, sir.

"Q. And you never made any objection at any time to his driving that car wherever he wanted to drive it? A. No, sir. I never made any objection at any time to his driving that car wherever he wanted to drive it. That was all right with me. And that is true when he was up in Iowa at the time of the collision. I think the license number that was transferred to this Oldsmobile was 49086 Missouri. And those license numbers were issued out of the office of the Secretary of State of Missouri. The certificate of title for the Oldsmobile 8 that was issued by the Secretary of State and Motor Vehicle Department of Missouri is on file in the State House in Missouri.

"Q. After that certificate of title was issued for this Oldsmobile 8 have you assigned the same to anyone? A. No."

That this presented a jury question is plainly apparent.

Complaint is also made as to the amount of the verdict and that this was brought about by misconduct of plaintiff's counsel in argument. We have given this matter our very careful consideration and find no merit in this contention. It was perfectly proper for plaintiff's counsel to make the comment in his closing argument in reply to the argument made by the defendants' counsel, and there was no error in making reference to the able, ingenuous, and masterful way in which defendants' counsel presented and conducted the defendants' cause. As to the amount of the verdict, we are not inclined to disturb the finding of the jury. As shown by the evidence, Miss Enfield was a very estimable young lady, 24 years of age, in the bloom of youth, of fine, gentle personality, thrifty and industrious. She was rated much above the average as a teacher, had an earning capacity as high as $105 per month in teaching, and a fine expectancy in her chosen profession. While the verdict as compared with some other verdicts is large, it is not excessive, and therefore must stand.

There are other assignments of error which we have considered, but to attempt to discuss each one separately would unduly extend this opinion. What we have already said disposes of this appeal, and nothing would be gained by a further

discussion of other alleged errors. We are of the opinion that the record as a whole presents no ground for reversal, and the case should be, and is, affirmed.—Affirmed.

KINTZINGER, C. J., and DONEGAN, MITCHELL, ALBERT, and PARSONS, JJ., concur.

POWERS, ANDERSON, and RICHARDS, JJ., dissent.

POWERS, J. (dissenting)—I am unable to agree with the majority that there was an issue for the jury in this case on the question of freedom from contributory negligence on the part of plaintiff's decedent. Circumstances will permit only a brief reference to the reasons.

The car in which plaintiff's decedent was riding belonged to her. It was being driven by one O'Neil, not only with her knowledge and consent, but for her use and benefit. She is therefore chargeable with whatever negligence there may have been on the part of the driver of her car. I do not understand that this proposition is in dispute in the case. It is mentioned here only to make clear at the outset that the situation is not different than what it would have been if the plaintiff's decedent herself had been the driver of her car. For convenience, we will refer to the car of plaintiff's decedent as plaintiff's car.

Viewing the evidence most favorable to plaintiff, we have this situation. Highway No. 6 is a paved east and west highway. Plaintiff was driving west on the north side, and defendant was driving east on the south side. They were both approaching a place in the highway where another paved highway leaves No. 6 at an angle to the southwest. There were no signs warning defendant of the existence of this highway, and traffic from it was required to stop before entering on No. 6. The plaintiff's decedent intended to take that road. When some 150 feet east of it, the driver of her car saw the defendant's car approaching from the opposite direction. It was night. The headlights of the oncoming car were shining. The driver of plaintiff's car then turned over on his left-hand side of the road directly in the path of the oncoming car and proceeded on the left-hand side of said paved highway a distance of 125 feet until the place was reached where the south-bound road turned from No. 6. He then attempted to cut the corner to get on the south-bound road and drove in front of defendant's

oncoming car and the collision occurred. After the driver of the plaintiff's car, when some 150 feet east of the place where the turn was to be made, saw the defendant's car, he did not look again at defendant's car, and paid no further attention to traffic approaching from that direction. This is the evidence on which plaintiff relies to carry the case to the jury on the question of the freedom of plaintiff's decedent from contributory negligence.

It should be emphasized that we are not here dealing with a case where we must apply the general test of negligence, lack of ordinary care. We have a case here where the driver of plaintiff's car was under a positive statutory duty. There were three different statutes designed to promote safety on the highway which were violated by the driver of plaintiff's car, and such violations were negligence per se in two instances and prima facie evidence of negligence in the other. A statute (section 5020) required the driver of plaintiff's car to turn to the right and yield one-half of the traveled portion of the road when meeting another vehicle. Instead, such driver at a time when he could see the defendant's car coming left the right-hand side of the road and turned over on the left-hand side directly in the path of defendant's car and traveled there until the collision occurred. A statute (section 5033) required that such driver in turning to the left from one highway to another, pass to the right of and beyond the center before turning. Instead, he turned to the left 125 feet before he got to the highway leading to the left and attempted to cut the corner close to the left-hand side of the highway into which he was entering. A statute (section 5032) required such driver, before changing his course and making a left-hand turn across the path of cars coming from the west, to first see that there was sufficient space to make such movement in safety. Instead, he attempted to turn from highway No. 6 to the highway leading to the southwest without looking at all; he looked when he was 150 feet from the place where such turn was to be made, saw defendant's car coming, did not look again until he reached the place where the turn was being made and the collision was imminent.

As I understand the majority, these violations are of no consequence in this case because the car of plaintiff's decedent had reached a point a few feet to the south of the south line

of the paving on highway No. 6, and on that part of the paving which goes to make up the highway which leads to the southwest. The reasoning is that under such circumstances there is no causal connection between the violations and the collision. There are some prior adjudications of this court which lend some support to the reasoning. But the question of causal connection is one of fact, not of law. Each case, therefore, involving the question must be determined upon its own peculiar facts. As applied to this case, it seems to me that the reasoning is unsound.

What caused this collision? If the driver of plaintiff's car had observed any one of the three statutory duties which he violated, it never would have happened. If the driver of plaintiff's car had yielded one-half of the traveled portion of the road to the defendant by turning to the right when he saw defendant's car coming and remained there until he reached the proper place to turn, and then ascertained whether he could make the movement in safety before attempting to turn, it could not very well have happened. Unless we are to substitute some mere formula for reality, the fact that the collision may have occurred a few feet south of that part of the paving which constitutes paved highway No. 6 proper can be of no consequence. It happened at a point, according to plaintiff's evidence, which might properly be called the south shoulder of No. 6. The presence of defendant's car at that point was the natural, ordinary, and almost necessary consequence of the manner in which the plaintiff's car was being operated. The defendant, as he was proceeding eastward on his right side of the road where he belonged, saw this car coming toward him on the left-hand side of the road directly in his path. He naturally supposed that it would turn to the right and yield one-half of the road. He watched it carefully. He did not dare to turn left and pass it on the left because the driver might wake up about that time and turn to his right and that would cause a collision. Moreover, the statute says that on meeting a car he should pass it on the right-hand side (section 5020). He crowded over on the shoulder of the road so as to avoid a collision. But the on-coming car, when it got almost even with him, turned more sharply to the left directly in his path. The defendant then attempted to turn left, but it was too late and a collision occurred. There is no dispute about these facts.

There is a dispute as to whether the collision occurred on the paving which constitutes highway No. 6 or on the additional paving which constitutes a part of the angling road. The majority, as I understand it, make the issue of contributory negligence turn entirely on that question. And the majority, by applying a straight edge, are able to demonstrate that, if the collision occurred where plaintiff claims it did, it would be off the paving which goes to make up paved highway No. 6 proper. It is not claimed that under plaintiff's evidence it would be more than a few feet off. There is testimony by the driver of plaintiff's car that the front end of it was 18 or 20 feet beyond the yellow line. It appears that plaintiff's car was 15 feet long, which would mean that the back end of plaintiff's car was from 3 to 5 feet from the yellow line when the collision occurred. It should be borne in mind that this yellow line extends right up to No. 6, and that it runs nearly north and south, and that plaintiff was traveling west when he reached it. So that, under plaintiff's theory, while he would be off of No. 6, it would be only a few feet off. I cannot see that it makes any substantial difference whether this collision occurred a few feet south of the south line of the paving which is No. 6 proper or a few feet north of that line. The cause of its occurrence is controlling, not the place. The only reason for defendant being off the paving which is a part of No. 6 proper and to his right side was because he was forced off by the negligent and unlawful manner in which plaintiff's car was being operated. There is no reason suggested as to why defendant got off his proper path except the very obvious and natural one, that it was being occupied unlawfully by plaintiff's car coming toward him and that to remain there would cause a collision. It is no answer to say that defendant was mistaken and that, if he had remained on the right side of No. 6, plaintiff would have gotten out of the way before the collision actually occurred. He was confronted with a perilous situation, an emergency. It caused him to do what he did. What he did was an ordinary and natural consequence of the perilous situation. Plaintiff, by violating the rules of the road, created the perilous situation. Under such circumstances there is a direct causal connection between the negligence of plaintiff and the presence of defendant's car at the place where it was and the collision which occurred there.

Much is said about the speed at which the defendant was driving, and it may be conceded for the purpose of this discussion that he was negligent. The undisputed fact remains, however, that he made an effort to avoid this collision, and was the only one who made any such effort. It should avail plaintiff nothing that defendant pursued a natural and a proper course to avoid the collision and to escape from the perilous position in which the conduct of the driver of the plaintiff's car had placed him.

There is one thought in connection with the failure to look before making the left turn which should be specially mentioned here. I am not unmindful of the fact that this court has held that one seeking to make a left turn is excused from contributory negligence if, before making the turn, his observations lead him to believe, as a reasonable person, that he can make the turn in safety even though it turns out that he was mistaken. This rule certainly shows a benevolent spirit toward those who violate traffic regulations. I take it that none of us would excuse one who engages in a race with a train to a railway crossing. Yet in that case there is no positive statutory duty as there is in the case of a man making a left turn across the path of oncoming traffic. The rule as announced by the court permits the motorist to race to the turn with such oncoming cars, and, if he loses, he may be excused from contributory negligence on the ground that he thought he could make it. It would seem that, if a traveler wishes to speculate on whether or not he can make it in safety, he might properly be held responsible for his error if he guessed wrong.

But it is not my purpose here to challenge a rule already established but to protest against its further extension. It certainly must be conceded that, if the plaintiff's car had proceeded straight ahead even on the left-hand side of the road in this case, there would have been no collision. Defendant was prepared to pass him on the right-hand side. That was prevented by the plaintiff turning to the left to take this side road. According to his own testimony, he did not look at all before making that turn. He looked the last time when he was 150 feet down the road. So that we are, by the opinion of the majority in the instant case, now saying that, notwithstanding the mandate of the statute, a traveler may make a left turn without looking at all for traffic from the opposite direction—

642

that it is sufficient if he looked when he was 150 feet away from the place where the left turn is made. More than that, we say that proof of such conduct by plaintiff is proof of freedom from contributory negligence, although the plaintiff in turning passed directly in front of a car coming from the opposite direction and a collision instantly occurred, and such oncoming car was at all times visible, and the only possible reason for a failure to see it was a failure to look.

I cannot escape the conclusion that the burden of showing freedom from contributory negligence is not met by evidence of plaintiff's wholesale violation of statutes designed to promote highway safety where it appears that such violation as a natural consequence forced defendant off the path he would have otherwise pursued and into the place where the collision occurred.

I would reverse on the ground that a verdict should have been directed for defendant because the plaintiff had failed to present evidence from which a jury could find plaintiff free from contributory negligence.

I am authorized to say that MR. JUSTICE ANDERSON and MR. JUSTICE RICHARDS join in this dissent.