RICHARD SCHERER, Appellant, v. HENRY A. SCANDRETT et al., Trustees, Appellees.

No. 46500.

NOVEMBER 14, 1944.

Hutchison & Hutchison, of Algona, for appellant.

Linnan & Lynch, of Algona, and Duncan, Hughes & Bierman, of Des Moines, for appellees.

SMITH, J.—One question only is presented on this appeal: Was there sufficient evidence of plaintiff's freedom from contributory negligence to warrant submission of that issue to the jury? Plaintiff had the burden of proof, but on the motion to direct verdict he was entitled to have the evidence bearing on that issue viewed in the light most favorable to himself. It becomes necessary to set out the substance of the record with that in mind.

Defendants are trustees of the property of the Chicago, Milwaukee, St. Paul & Pacific Railroad Company. One of its

lines runs east and west through the village of Sexton, in, Kossuth county. The collision in question occurred about noon on June 8, 1942, at a street or highway crossing in said village. Plaintiff, then twenty years old, was driving his automobile north toward the crossing on a graveled road or street. His car was equipped with four-wheel brakes and newly purchased tires, all in good condition.

Defendants' freight train approached the crossing from the east. It was a clear day. The windows of plaintiff's car were down. He was a stranger to the vicinity but had driven south over the same crossing about an hour earlier the same day.

He testified he knew he was approaching the railroad track and that "they run a lot of passenger and freight trains on the track, some of which run pretty fast and some not so fast." He says he was listening for a train as he proceeded into the railroad right of way. He heard no whistle and no bell. Two witnesses, Mrs. Joseph Krieps and Wallace Anderson, who were at a point in the highway in front of the Krieps house 275 to 300 feet south of the crossing testified quite positively that no signals were sounded. Other witnesses were equally positive that the statutory signals were given.

Plaintiff and the two witnesses referred to fix the speed of his car ,as he passed these witnesses and approached the crossing at fifteen to twenty miles per hour. Before reaching the Krieps house he had been going thirty-five to forty. The view to the west (on his left) was open and unobstructed; to the east there were obstructions:

"I knew that was the dangerous side, so I never paid much attention to the left-hand side."

Two tracks of the railroad cross the highway at this point. The northerly one was the main track, the southerly one a passing track. The south rail of the main track and the north rail of the south or passing track were 11½ feet apart. The distance between rails on each track is 4 feet 8 inches.

The collision occurred on the main track, which, according to plaintiff's own testimony, is 45 feet from the south edge of the right of way. On the east side of the road, just south of the crossing, is the Weaver place, bounded on the north by the right

of way, with wire fence between. One witness says the level of the ground of the Weaver lot is 4 to 5 feet higher than the level of the highway. Another says it is some higher.

Trees and bushes and the house on the Weaver lot obstruct the view to the east of one on the highway approaching the crossing from the south until he reaches the edge of the railroad right of way. A large cottonwood tree near the north edge of that lot overhangs the right of way "four or five or six feet." The witnesses also enumerate weeds in the right of way as obstructions but it clearly appears they were not high enough to interfere with the view of an approaching train. Right at the corner of the Weaver lot is a telephone pole and there are high-line poles running east along the railroad right of way. Both highway and railroad are level at the crossing and in each direction so far as material to this inquiry.

Plaintiff's own testimony (corroborated by the testimony of witnesses on his behalf) is to the effect that at a point 45 feet south of the railroad track (at the edge of the right of way) he could see 75 to 100 feet down the track to the east, that the cottonwood tree and the poles and bushes prevented his seeing farther in that direction. That was the last point at which he looked except just as the train was upon him:

"Q. At thirty-five feet how far could you see down the track? A. I don't know. I was not looking—I was not looking at thirty-five feet down the track, or forty feet either. Q. The only point you want to tell this jury you looked was at the corner of the Weaver fence and the right-of-way where your view to the east was obstructed so you could only see seventy-five to one hundred feet down the track? Is that correct? A. Yes, around in there. I could not give exact measurements because I don't know about that. Q. That is the only place you looked to the east? A. Yes. Q. To discover an approaching train? A. The second time I looked the train was coming down the track. Q. That was too late then? A. I didn't get stopped then. Q. After you passed the point of forty-five feet, or the right-of-way fence and the Weaver lot, as a matter of fact the view substantially increased so you could see any distance down the railroad tracks to the east? A. Oh, I think you have to get

right up to the tracks before you can get a clear view down to the east. I was down there since the accident and I purposely looked for that.''

Mrs. Krieps estimates (without having measured) that up to a point 25 feet south of the main-line track the view to the east was *completely* obstructed. Anderson says ''you would have to be about twenty-five or thirty feet from the main track'' before you would have an unobstructed view down the railroad.

Plaintiff, as we have said, testifies that he approached the south edge of the right of way at fifteen or twenty miles per hour. It is difficult at this point to summarize his testimony. After testifying that he looked at the point 45 feet south of the main track his testimony is as follows:

''Q. And you didn't look again? A. I didn't say I didn't look again. I looked again and I seen the train coming. Q. Where were you then? A. I was right onto the switching track or side track.* * * Q. You were south of the side track? A. Yes. Q. And how far were you then from the main track? A. Oh, twenty or thirty feet—twenty-five feet or thirty feet. Q. And at the time you looked at the point forty-five feet south of the main track—and you are sure that is forty-five feet? You have measured it since? A. Yes, we measured it. Q. How fast was your automobile being driven? A. I don't remember of slowing—I remember when I got close to the track—I don't remember slowing down until—Q. How fast were you going? A. About fifteen or twenty miles an hour. Q. At that point you were going fifteen or twenty miles an hour, and didn't see any train or anything, so I assume when you went on the passing track you were going fifteen or twenty miles an hour? A. I could not say for sure, but I think that is the speed I was going.''

In describing the collision he says he saw the front end of the engine pass, ''what they call the cowcatcher, probably about fifteen feet of the engine, ten to fifteen feet.'' Witnesses Krieps and Anderson think his car had stopped before the collision, but, in any event, it seems clear that the front of his car and what is referred to in the briefs as the ''rock arm or cylinder head'' at the side of the engine came in contact with each other.

Plaintiff does not think he was on the passing track yet when he applied his brakes:

"Q. Well, in any event, Mr. Scherer, you were going too fast to stop your car, no matter where it was, when you first discovered this train approaching? A. I didn't get it stopped in time. Q. You were going too fast to stop it; you did all you could to stop it? A. That is right. Q. You were just going too fast? A. If I was driving slower, I perhaps would have stopped, if I had seen it in time."

Plaintiff's witnesses who saw the collision both estimate the speed of the train at fifty miles per hour; one says "approximately forty-five to fifty." They say when the train came to a stop seventy cars of the train were west of the crossing. Mrs. Krieps thought there were as many or possibly more still to the east. The conductor testified that at the time of the accident the train consisted of an engine and tender, fifty cars, and a caboose.

As plaintiff approached the crossing from the south he passed witnesses Krieps and Anderson on his left. Anderson was sitting in a parked automobile on the west side of the road and Mrs. Krieps was standing by it talking to him. North of the Krieps home some trucks were standing and beyond them a Model-A Ford was coming out of a lane on the west side of the highway and south of the railroad right of way. The Ford slowed up and allowed him to pass and he paid no further attention to it.

According to plaintiff's testimony, after looking to the right as he came upon the right of way and seeing no train coming from the east, he glanced to the left, then straight ahead, and saw a man on the other side of the track, 200 or 300 feet ahead, "waving at him and motioning with his arms: Q. Did you look at him for any appreciable length of time? A. I just looked, and then I looked quick to the right."

It was then he saw the approaching train "about fifty feet down the track" and his car was then "maybe twenty feet from the track, twenty or twenty-five from the main track * * * almost up to the passing track." He was still going fifteen to twenty miles per hour.

I. This, in substance, is the record which appellant contends should have been submitted to the jury. Does it make a prima facie case on the issue of freedom from contributory negligence?

The trial court sustained appellees' motion to direct on two of the grounds urged: "2. That the evidence establishes that the plaintiff was guilty of contributory negligence * * *" and "3. That upon the entire record, in the event this case is submitted to the jury and the jury returns a verdict in favor of the plaintiff, it would be the duty of the Court to set the verdict aside upon the insufficiency of the evidence."

It is not necessary to pass on the merits of the first of these grounds, for the burden was not upon appellees to establish that appellant was guilty of contributory negligence. We are concerned only with the sufficiency of the evidence of appellant's *freedom* from contributory negligence.

There is a fundamental difference between these two methods of approach to this question. We have not always been careful to maintain this distinction but it is important to be kept in mind.

II. The difficulty in cases of this kind is not so much in stating the principles involved as in applying them to the facts testified to by the witnesses. We have examined all the cited cases but are not disposed to discuss or distinguish the many relied on by appellant, nor to cite all those which, in varying degrees, are pertinent as supporting our conclusions. Being convinced from a careful consideration of the record that the trial court acted properly in directing verdict for appellees, we shall state as briefly as may be our reasons.

The language of the opinion in Artz v. Chicago, R. I. & P. R. Co., 34 Iowa 153, 161, has been much quoted to the proposition that if there are obstructions to the view the question of freedom from contributory negligence is always one for the jury. Carefully read, the actual holding of that case is probably not so broad. The court had already decided that the case should be reversed and the language referred to was not strictly necessary to its determination. Since that time there have been many decisions which qualify the language in the Artz case if it is to be so broadly construed.

In Glessner v. Waterloo, C. F. & N. R. Co., 216 Iowa 850, 853, 249 N. W. 138, 139, we said:

"The action of the trial court in sustaining the motion was undoubtedly correct. The law does not undertake to direct whether a traveler upon the highway shall first look to the right or to the left before crossing tracks, or to fix the place where observation shall be made. It does require that the traveler shall look at a place where he can see, *and that he shall then be in a situation to avoid injury by the operation of. cars upon the tracks.*" (Italics supplied.)

Appellant's whole argument here is based upon the proposition that, "As the plaintiff drove the last several hundred feet before reaching the right-of-way, he could not see the track as it extended east from the crossing by reason of the various obstructions." In appellant's brief and argument it is said:

"Although some of defendant's witnesses testified that there was an occasional place where you could get a flash view through the trees, all of defendant's witnesses and the plaintiff's witnesses agreed that there was a constant obstruction for a person driving along in an automobile and that it was impossible to see to the right, from a point several hundred feet south up to the right-of-way."

The testimony of plaintiff is clear that he understood this situation, although he had never been over the crossing until he crossed it earlier that day. We are compelled to conclude from his own testimony and the testimony of his witnesses that he approached the crossing knowing his view to the east was obstructed. When he came about to the edge of the right of way, 45 feet from the crossing, he says he could see only 75 to 100 feet down the track to the east. He must have known that as he went farther north the view to the east would lengthen. He must also have known that if a train was coming from the east from a point farther than 75 to 100 feet it might be coming at a rate of speed such as to make it impossible for him to cross ahead of it. His own testimony is that when he came to a point approximately at the edge of the right of way and 45 feet from the main track he was traveling fifteen to twenty

miles per hour. He continued at that speed until he was only 25 or 30 feet from the track and saw the train about 50 feet away. He says, in effect, that he does not remember of slowing down until then. There is no evidence of any diverting circumstances or deceptive appearances excusing him from the duty of looking at a place where he could see *and from having his car under control so as to be able to stop if he then discovered the approach of a train.* There was placed upon him an affirmative duty to exercise care under the known circumstances and there was an affirmative burden placed upon him in this case to produce evidence that he exercised such care.

Appellant does not claim that the motions of the man on the other side of the track diverted his attention. That such claim could not be made see Ballard v. Chicago, R. I. & P. R. Co., 193 Iowa 672, 185 N. W. 993.

In Darden v. Chicago & N. W. R. Co., 213 Iowa 583, 586, 239 N. W. 531, 533, after pointing out that if plaintiff had stopped her car 25 feet back from the crossing she could have seen 360 feet to the south; at 20 feet back she could have seen 510 feet; and at 15 feet, 954 feet, we said:

"The duty is placed on the driver of an automobile to look and listen for trains, and it was one of plaintiff's duties to look, at the place where, by looking, she could have seen * * *." Citing Hinken v. Iowa Cent. R. Co., 97 Iowa 603, 66 N. W. 882; McFarland v. Illinois Cent. R. Co., 193 Iowa 776, 187 N. W. 947; High v. Waterloo, C. F. & N. Ry. Co., 195 Iowa 304, 190 N. W. 331; Nederhiser v. Chicago, R. I. & P. R. Co., 202 Iowa 285, 208 N. W. 856; and Bradley v. Missouri Pac. R. Co., 8 Cir., Ark., 288 F. 484.

In the Hinken case, supra, we said [97 Iowa 606, 66 N. W. 883]: "If plaintiff had stopped and looked for the train, even after he had crossed the side-track, this sad accident would not have happened. * * * He knew, however, that his view of the track was obstructed for some distance just before reaching the side-track. This fact, alone, should have made him the more cautious, after he arrived at a place where he had an unobstructed view of the track."

We affirmed the lower court in directing verdict in this case.

In Reeves v. Dubuque & S. C. R. Co., 92 Iowa 32, 36, 60 N. W. 243, 245, we pointed out that if plaintiff had looked at the point where his view became unobstructed he would have seen the train and could have avoided the accident *"if he had been driving with that degree of care one should exercise when he knows he is near a railroad crossing."* (Italics supplied.)

Numerous later cases support the rule that in absence of diverting circumstances or deceptive appearances, a motorist approaching a crossing, who knows his view is obstructed until he is close to the track, must, in the exercise of due care, not only look when he reaches the point where looking is possible but must then have his own vehicle under such reasonable control as to enable him to stop if necessary to avoid collision. See Hitchcock v. Iowa Southern Utilities Co., 233 Iowa 301, 6 N. W. 2d 29; Nurnburg v. Joyce, 232 Iowa 1244, 7 N. W. 2d 786; Carlin v. Thompson, 234 Iowa 469, 12 N. W. 2d 224; Dean v. Chicago, B. & Q. R. Co., 211 Iowa 1347, 229 N. W. 223.

In Bannister v. Illinois Cent. R. Co., 199 Iowa 657, 659, 202 N. W. 766, 767, we upheld the trial court in directing a verdict for defendant, and said:

"It is shown that, when he first looked to the east, his view was obstructed, and he knew it; and that he did not again look to the east until he reached a point where a collision could not be avoided."

The citations and quotations could be extended much further but the foregoing sets out the law we believe applicable to this case. We are compelled to the conclusion that the trial court properly directed a verdict for defendant. The case is affirmed.—Affirmed.

MANTZ, C. J., and HALE, MILLER, and WENNERSTRUM, JJ., concur.

BLISS, GARFIELD, MULRONEY, and OLIVER, JJ., dissent.

BLISS, J. (dissenting)—I dissent from the majority opinion because, in my judgment, it clearly trespasses upon the province

of the jury, violates sound and long-recognized principles of law and procedure, and passes without mention our latest reaffirmance of a number of these principles in Coonley v. Lowden, 234 Iowa 731, 12 N. W. 2d 870.

I recognize, of course, that the issue of freedom from contributory negligence is not always for the jury. But I insist that this court and all courts have uniformly held that the issue is ordinarily for the jury, and that it is the very exceptional case when it is a question of law for the court. I am fearful that with the majority opinion as a guide the exception will become the rule in railroad-crossing cases, and, logically, in highway-intersection collision cases.

Under our statutes and rules of procedure, in law actions questions and issues of fact are to be submitted to a jury for determination, under instructions as to the law received from the court. The reasons therefor are well expressed by the learned and experienced Judge Cooley, in People v. Garbutt, 17 Mich. 9, 27, 97 Am. Dec. 162, thus:

"The jurors, and they alone, are to judge of the facts, and weigh the evidence. The law has established this tribunal because it is believed that, from its numbers, the mode of their selection, and the fact that the jurors come from all classes of society, they are better calculated to judge of motives, weigh probabilities, and take what may be called a common sense view of a set of circumstances, involving both act and intent, than any single man, however pure, wise and eminent he may be."

In Ernst v. Hudson River R. Co., 35 N. Y. 9, 40, 90 Am. Dec. 761, the New York Court of Appeals, in reversing a nonsuit in a railroad-crossing case, speaking through Judge Porter, said:

"If it be true, as is sometimes intimated, even from the bench, that false verdicts are occasionally rendered on questions like this, the remedy is to set them aside, and not to usurp the prerogative of the jury. Even among the cases which have been held so plain as to justify a nonsuit, there have been few in which the judges have not themselves disagreed; and the in-

quiry naturally occurs to the mind, whether we are less liable than jurors to err, on questions of pure fact, pertaining to the ordinary affairs of life. Our law is framed upon the theory that, on such questions, the citizen can rely with more security on the concurrent judgment of twelve jurors than on the majority vote of a divided bench. Unanimity is not required in our decisions on questions of law. It is otherwise with jurors charged with the duty of determining issues of fact; and such issues should not be withheld from the usual arbiters, unless the evidence leads so clearly to one result that there is no room for honest difference between intelligent and upright men.''

. The consequences resulting from a nonsuit or a direction of a verdict are so vastly different, with respect to the two parties, that both the trial and the appellate court should resolve every reasonable doubt in favor of the nonmoving party. A sustaining of the motion puts the other party out of court, while its denial allows the moving party to submit his case to the jury, which may grant him all he asks.

This court, by its decisions, has recognized this fact. As said in Hawkins v. Interurban R. Co., 184 Iowa 232, 242, 168 N. W. 234, 237, a crossing case, '''save in cases exceptionally free from doubt, the question must be left to the answer of the jury.' '' [Hartman v. Chicago G. W. R. Co., 132 Iowa 582, 585, 110 N. W. 10, 11.]

Quoting from Hendrickson v. Great Northern R. Co., 49 Minn. 245, 252, 51 N. W. 1044, 1045, in Corbett v. Hines, 194 Iowa 1344, 1351, 191 N. W. 179, 182, this court approved:

'' '* * * the measure of ordinary care is so variable that the question of negligence becomes *usually* and *peculiarly* a function for the jury, and the courts can but *rarely* declare a particular act to be conclusive evidence of negligence.' '' (Italics supplied.)

As said in Barnes v. Barnett, 184 Iowa 936, 941, 169 N. W. 365, 367, ''the existence of contributory negligence is *peculiarly* a jury question * * *.'' The issue should not be taken from the jury, ''*If there is any rational, reasonable theory of the case* developed by the evidence, under the issues made, which after

a just consideration *of all the evidence* would justify the jury in finding that the plaintiff is not guilty of contributory negligence * * *." Wolfe v. Chicago G. W. R. Co., 166 Iowa 506, 513, 147 N. W. 901, 904. (Italics supplied.)

I am not trying to revitalize the "scintilla of evidence rule." It has no application in this case. There is ample evidence to require the submission of the question of the appellant's freedom from contributory negligence to the jury.

We have said repeatedly:

"It is the well settled rule of law in this state that if there is *any evidence tending to establish* plaintiff's freedom from contributory negligence, that question is one for the jury." (Italics supplied.) Huffman v. King, 222 Iowa 150, 154, 268 N. W. 144, 147, and cases cited.

To the same effect, see Montanick v. McMillin, 225 Iowa 442, 447, 448, 280 N. W. 608; Lorimer v. Hutchinson Ice Cream Co., 216 Iowa 384, 389, 249 N. W. 220; Hanson v. Manning, 213 Iowa 625, 239 N. W. 793; Lawson v. Fordyce, 234 Iowa 632, 636, 12 N. W. 2d 301, 303. In Fitter v. Iowa Tel. Co., 143 Iowa 689, 693, 694, 121 N. W. 48, 50, we said:

"Proximate cause and contributory negligence are questions for the jury, *save in very exceptional cases* where the facts are *so clear and undisputed,* and the relation of cause and effect so apparent to every candid mind, that but one conclusion may be fairly drawn therefrom." (Italics supplied.)

In Toney v. Interstate Power Co., 180 Iowa 1362, 1378, 163 N. W. 394, 400, speaking by Justice Weaver, the court said:

"As we have often said, the question of contributory negligence is *peculiarly one of fact and not of law, save only in those exceptional cases where the plaintiff's want of reasonable care is so manifest and flagrant as to at once convince all fair and candid minds* that he did not exercise the caution for his own safety which marks the conduct of ordinarily prudent men. *He is not held to an ideally high standard of care as being free from all grounds of criticism.* It is enough if the evidence be

such that the jury may properly say that he acted as carefully as ordinary men of ordinary judgment and experience usually do under like circumstances." (Italics supplied.)

For like language, see Beman v. Iowa Electric Co., 205 Iowa 730, 735, 218 N. W. 343.

"* * * it is only in *plain cases* that the court is justified in holding, as a matter of law, that one injured at a railroad crossing is guilty of negligence." (Italics supplied.) Swegle v. Chicago, B. & Q. R. Co., 196 Iowa 413, 424, 192 N. W. 894, 899.

It has been repeated so often as to be an axiom, that if fair-minded and reasonable men would differ on the question of fact as to whether or not the injured person was guilty of contributory negligence, then the case should be submitted to the jury on that issue. Ordinary care, and not super, perfect, extraordinary, or the highest care, is all that the law demands. As expressed in McKern v. Wabash R. Co., 195 Iowa 410, 412, 192 N. W. 152, 153:

"Perfect care or judgment is not given to mankind, and if a person exposed to danger conducts himself with the caution which may reasonably be expected of a person of ordinary prudence and ordinary presence of mind, he is not to be charged with fault, *even though, as a matter of cool afterthought or mature consideration, he might better have done otherwise.*"

Speaking through Justice Preston, in Upton v. Hines, 193 Iowa 385, 389, 390, 185 N. W. 561, 562, the court said:

"It is important that the triers of questions of fact as to the alleged negligence of the defendant and the contributory negligence of the plaintiff should put themselves, as nearly as may be, in the position in which the parties were situated at the time of the accident. It is a matter of some difficulty to do this, in every case. *It is not so difficult, after an accident, to go to the place, and, by the use of instruments, or by taking photographs from a definite, fixed, and exact standing position, to say that, under such circumstances, the person approaching a crossing could or should have seen certain things.*" (Italics supplied.)

Other decisions supporting the above propositions are: Hines v. Chicago, M. & St. P. R. Co., 196 Iowa 109, 116, 194 N. W. 188, 191, wherein the court, through Justice DeGraff, said:

"In order that we may say that a plaintiff is guilty of negligence as a matter of law his negligence must be *so palpable* that reasonable minds could not differ in the conclusion that he was negligent." (Italics supplied.)

See, also, Johnson v. Omaha & C. B. St. R. Co., 194 Iowa 1230, 1233, 190 N. W. 977; McSpadden v. Axmear, 191 Iowa 547, 551, 181 N. W. 4; Nelson v. Hedin, 184 Iowa 657, 659, 169 N. W. 37; Haven v. Chicago, M. & St. P. R. Co., 188 Iowa 1266, 1267, 1268, 175 N. W. 587; Sexauer v. Dunlap, 207 Iowa 1018, 1021, 222 N. W. 420; Love v. Fort Dodge, D. M. & S. R. Co., 207 Iowa 1278, 1282, 1286, 224 N. W. 815; Wheeler v. Peterson, 213 Iowa 1239, 1242, 1243, 240 N. W. 683; Markle v. Chicago, R. I. & P. R. Co., 219 Iowa 301, 303, 257 N. W. 771; McWilliams v. Beck, 220 Iowa 906, 915, 262 N. W. 781; Enfield v. Butler, 221 Iowa 615, 621, 264 N. W. 546; Lutz v. Davis, 195 Iowa 1049, 1052, 192 N. W. 15, 17.

In Pierce v. Dencker, 229 Iowa 479, 484, 294 N. W. 781, 783, Justice Hale said:

"We have so many times held that contributory negligence is ordinarily a question for the jury and that, if there is *any evidence tending to establish plaintiff's freedom from contributory negligence,* that question is one for the jury, that authorities need hardly be cited."

Other cases in point on this matter are: Finley v. Lowden, 224 Iowa 999, 1003, 277 N. W. 487; In re Estate of Green, 224 Iowa 1268, 1273, 1274, 278 N. W. 285; Short v. Powell, 228 Iowa 333, 335, 291 N. W. 406; Lathrop v. Knight, 230 Iowa 272, 276, 277, 297 N. W. 291; Hunt v. Delano, 169 Iowa 138, 142, 151 N. W. 106. In Finley v. Lowden, supra, 224 Iowa 999, 1003, 277 N. W. 487, 490, Justice Sager said:

"This is in line not only with the almost universal holdings in other jurisdictions, but with our own decisions."

The majority opinion quotes from Bannister v. Illinois Cent. R. Co., 199 Iowa 657, 659, 202 N. W. 766, 767, wherein a directed verdict for the defendant was sustained, as follows:

"It is shown that, when he first looked to the east, his view was obstructed, and he knew it; and that he did not again look to the east until he reached a point where a collision could not be avoided."

The facts in that case are much different from the facts in this one. The driver was intimately acquainted with the crossing and had frequently driven over it. The accident happened at 4:25 p. m., and he knew that the train which hit him was scheduled to arrive between 4:20 and 4:25 p. m. He testified that he was not "relying on gates, flagman, or gong to warn me of the approach of the train." He looked at a point where he could not see at all. In the case before us the appellant was a stranger in the vicinity of the village of Sexton. And he was not "intimately acquainted with the crossing." He had passed over it only once before, and that was going *south* about an hour before, with a clear view of the track east and west of the crossing, and with no occasion to observe obstructions to the view of one traveling north. He was looking for the Krieps home, which was about 275 feet south of the crossing on the west side of the road. Mrs. Krieps told him he would find her husband about a mile south and a half mile west. He returned by the same route, traveling north at a speed of thirty-five or forty miles an hour, until he approached the Anderson car parked in the highway in front of the Krieps house, with Mrs. Krieps standing by the car talking to Anderson. He slowed his car to fifteen or twenty miles an hour and pulled over to the right side of the graveled roadway, which was about 22 feet wide, and proceeded north toward the crossing without increasing his speed. He knew nothing about the train schedules. He knew of the railroad crossing and that a train might cross from either the east or the west, and he approached it with that thought in mind. He knew that the operators of railroad trains gave signals by bell and whistle at highway crossings. He had his car windows down and he listened for signals. The view to the west was the more open one. But to the east

for several hundred feet south of the crossing the view was almost completely obstructed except for a possible "flash" or "glimpse," as some witnesses put it. The Weaver place, with its buildings, grove and shrubbery, was just south of the right of way, with the house about 20 feet from the roadway and 60 feet south of the south rail of the main track. South of the Weaver place there were two other sets of buildings with groves in immediate succession. He was not familiar with the exact character or density of the obstructions to his view eastward and he scanned them as he went along. He testified: "I was watching the place where I was facing—*I was looking to the right all along.*" The following is from the cross-examination of appellant:

"Q. Now, as you drove along there you were thinking then about trains, and seeing the tracks and seeing the warning sign, and your view was obstructed to the east there so you could not see to the east to see whether the train was coming? A. That is right. Q. And as you drove along there, you knew that? A. Yes, I knew that. I was looking. I knew that was the dangerous side, so I never paid much attention to the left-hand side. Q. You were paying attention to the condition to the east? A. Yes."

Ignoring the answers of the witness, appellees' attorney then asked:

"Q. When you got to the point of approximately forty-five feet south of the main line track, *that is the only point that you looked to the east?* A. *That is the only point where I could get any view of the track at all.*"

At that point, although the view was obstructed, he looked and said he could see eastward along the track for about 75 or 100 feet, but there was no train at that distance. He saw no train and he heard no signal. Then he thought it a matter of prudence to look to the west. He glanced in that direction and saw no train, and as he turned again to look to the east he saw a man north of the crossing waving his arms. Asked if he looked at him for any appreciable time, he replied: "I just looked, and then I looked quick to the right." He saw the train

coming about 50 feet away. His car was about 20 or 25 feet from the main track, almost up to the passing track, the south rail of which was about 16 feet from the south rail of the main track or about 12 feet from the overhang of the train. He slammed on his brakes and in his judgment he brought the car to a stop. The cowcatcher of the engine passed by the car without touching it but the protruding cylinder head caught the front of the car and swung it sideways against the engine, and it was carried or rolled to the west of the highway.

The majority opinion assumes, I think I may fairly say, that the jury could have found the facts as I have stated them, but it holds that they conclusively establish that appellant was not free from contributory negligence. The basis of the holding is that the appellant was negligent as a matter of law in looking to the west, and in not continuing to look to the east, or in not first looking again to the east. That, in my judgment, is not the law, and this court has repeatedly held to the contrary. In Hines v. Chicago, M. & St. P. R. Co., supra, 196 Iowa 109, 114, 115, 194 N. W. 188, 190, the court said:

"We have frequently said that a plaintiff in personal injury actions is not guilty of negligence as a matter of law because he did not look or listen at any particular point to discover an approaching train before entering a zone of danger. It is his duty to be vigilant and to exercise that degree of care and caution which the reasonably prudent person would exercise under the circumstances and this question ordinarily is one for the jury. Having looked and listened within a reasonable distance of a dangerous crossing, whether he should have looked or listened again at some other point or place is ordinarily for the jury to decide, and it is not for the court to say as a matter of law in the instant case that the failure to look twice or any number of times in any direction makes him guilty of contributory negligence."

In Glanville v. Chicago, R. I. & P. R. Co., 196 Iowa 456, 460, 193 N. W. 548, 550, the court said:

"It is by these tests that her negligence must be measured but there is no fixed or inflexible rule. The law does not fix

any point at which the traveler must look and listen or be chargeable with contributory negligence." (Citing cases.)

In McKern v. Wabash R. Co., supra, 195 Iowa 410, 414, 192 N. W. 152, 154, the court said:

"The point with which appellant [defendant] closes and emphasizes its argument for a reversal is that: 'Somewhere between a point 84 feet west of the crossing and 40 feet west of the crossing it was the duty of the deceased to look for the train, and to continue to look and listen until he ascertained there was no danger, and to have his automobile under control, and not to rush upon the track in front of the train.' It is much easier to frame a rule which sounds well to the ear as an abstract proposition than it is to make practical application of it to every concrete condition of fact."

The judgment was not reversed.

We have held in analogous cases that the traveler need not be constantly on the lookout. Read v. Reppert, 194 Iowa 620, 627, 190 N. W. 32; Wine v. Jones, 183 Iowa 1166, 162 N. W. 196, 168 N. W. 318; Roberts v. Hennessey, 191 Iowa 86, 95, 98, 99, 181 N. W. 798.

In Case v. Chicago G. W. R. Co., 147 Iowa 747, 752, 126 N. W. 1037, 1039, we said:

"One about to cross a railway track is not bound, as a matter of law, to look or listen for a train at any given point. Whether or not he looked and listened at a point where he might have seen the train and avoided the injury in the use of ordinary care and prudence is generally a question for the jury."

The language is repeated and approved in Davitt v. Chicago G. W. R. Co., 164 Iowa 216, 221, 223, 145 N. W. 483.

In Winey v. Chicago, M. & St. P. R. Co., 92 Iowa 622, 625, 61 N. W. 218, 219, we reversed a judgment for defendant because the court instructed that it was the duty of plaintiff *"'to look and listen for approaching trains at all points in his passage,'"* saying:

"The words we have italicized make it the duty of a person to look and listen for approaching trains *at all points* in his

passage, and hold him guilty of contributory negligence if he fails. *This rule is too broad—First, because it usurps the province of the jury; and, next, because it requires the traveler to keep his eyes constantly on the track for trains at all points leading to its passage, whether the view of the train is obstructed or not.''* (Italics supplied.)

In Butterfield v. Chicago, R. I. & P. R. Co., 193 Iowa 323, 326, 327, 185 N. W. 151, 153, the court said:

''The extent of his duty is to exercise the care of a person of average or reasonable prudence; *and, it being shown that he did look and listen within a reasonable distance of the crossing, the question whether he ought to have looked or listened again, at some other point or place, is for the jury, and not for the court.''* (Citing many Iowa decisions. Italics supplied.)

The same principle of law is unequivocally stated in the following cases: Barrett v. Chicago, M. & St. P. R. Co., 190 Iowa 509, 515, 516, 175 N. W. 950, 180 N. W. 670; Rupener v. Cedar Rapids & Iowa City R. & L. Co., 178 Iowa 615–618, 159 N. W. 1048; Willfong v. Omaha & St. L. R. Co., 116 Iowa 548, 554, 90 N. W. 358; Cummings v. Chicago, R. I. & P. R. Co., 114 Iowa 85, 88, 86 N. W. 40; Schulte v. Chicago, M. & St. P. R. Co., 114 Iowa 89, 94, 86 N. W. 63; Harper v. Barnard, 99 Iowa 159, 68 N. W. 599; Wiese v. Chicago G. W. R. Co., 182 Iowa 508, 511, 166 N. W. 66; Hawkins v. Interurban R. Co., supra, 184 Iowa 232, 238, 168 N. W. 234; Haven v. Chicago, M. & St. P. R. Co., supra, 188 Iowa 1266, 1267, 175 N. W. 587; Moore v. Chicago, St. P. & K. C. R. Co., 102 Iowa 595, 600, 71 N. W. 569; Nederhiser v. Chicago, R. I. & P. R. Co., 202 Iowa 285, 289–291, 208 N. W. 856; Love v. Fort Dodge, D. M. & S. R. Co., supra, 207 Iowa 1278, 1286, 224 N. W. 815; **Markle** v. Chicago, R. I. & P. R. Co., supra, 219 Iowa 301, 304–306, 257 N. W. 771; Artz v. Chicago, R. I. & P. R. Co., 34 Iowa 153, 161; Bush v. Chicago, R. I. & P. R. Co., 216 Iowa 788, 793, 247 N. W. 645; Huffman v. King, supra, 222 Iowa 150, 155, 268 N. W. 144; Gray v. Chicago, R. I. & P. R. Co., 160 Iowa 1, 139 N. W. 934; Lockridge v. Minneapolis & St. L. R. Co.,

161 ·Iowa 74, 85, 86, 140 N. W. 834, Ann. Cas. 1916A, 158; Dusold v. Chicago G. W. R. Co., 162 Iowa 441, 447–449, 142 N. W. 213; Brossard v. Chicago, M. & St. P. R. Co., 167 Iowa 703, 719, 720, 149 N. W. 915; Hough v. Illinois Cent. R. Co., 169 Iowa 224, 233, 234, 149 N. W. 885; Laverenz v. Chicago, R. I. & P. R. Co., 56 Iowa 689, 694, 10 N. W. 268; Selensky v. Chicago G. W. R. Co., 120 Iowa 113, 116, 117, 94 N. W. 272; Ames v. Waterloo & C. F. R. T. Co., 120 Iowa 640, 643, 95 N. W. 161; Hartman v. Chicago G. W. R. Co., 132 Iowa 582, 584, 585, 110 N. W. 10; Mackerall v. Omaha & St. L. R. Co., 111 Iowa 547, 548, 82 N. W. 975; Parker v. Des Moines City R. Co., 153 Iowa 254, 262, 265, 133 N. W. 373, Ann. Cas. 1913E, 174; Bruggeman v. Illinois Cent. R. Co., 147 Iowa 187, 207, 123 N. W. 1007, Ann. Cas. 1912B, 876; Meyer v. Chicago, R. I. & P. R. Co., 134 Iowa 722, 724, 725, 112 N. W. 194; Coonley v. Lowden, supra, 234 Iowa 731, 735, 12 N. W. 2d 870, 874, 875.

On this point, the ·court, in affirming a judgment for plaintiff, in Butterfield v. Chicago, R. I. & P. R. Co., supra, 193 Iowa 323, 325, 185 N. W. 151, 152, said:

"The defendant's main reliance below and in this court is upon the proposition that deceased is chargeable with contributory negligence, as a matter of law. In support of this theory, engineers, photographers, and other witnesses were examined, showing the location and surroundings of the crossing, from which it is argued that, if deceased or Murphy had looked west after turning into Seventh Street, they could have seen the approaching train; and upon that assumption, it is insisted that, in failing to discover the danger, they were, of necessity, and as a matter of law, negligent. *This contention, that if, by use of engineering instruments or by laying a 'straight edge' upon a map or blue print made at leisure after the tragedy is over, it is made to appear that, if the traveler on the highway had looked from some designated station or standpoint, and if the train had then been in the direct line of vision, he could have discovered it and avoided a collision, the court must say, as a matter of law, that his failure to do so is contributory negligence, is one which has been, with great persistence and*

*tireless repetition, urged upon the court during the half century and more of the era of railway development in Iowa; and, with here and there a slight sporadic departure from the settled rule, we have steadily held that, if the traveler is shown to have looked and listened when within reasonable distance of the crossing, the court will not attempt to say, as a matter of law, that he is guilty of contributory negligence because he did not look or listen again at some other designated point, from which he might possibly or even probably have discovered the train. He is not charged with the duty of discovering at his peril every danger which perfect care and caution may reveal to him.* The extent of his duty is to exercise the care of a person of average or reasonable prudence; *and, it being shown that he did look and listen within a reasonable distance of the crossing, the question whether he ought to have looked or listened again, at some other point or place, is for the jury, and not for the court.* [Citing numerous decisions.] *The foregoing is by no means an exhaustive list of the precedents in point, but they are sufficient to suggest the gravity of the situation which would be created in our case law if the appellant's revolutionary contention in this case were to be adopted.''* (Italics supplied.)

A judgment for plaintiff was affirmed. The opinion, by Justice Weaver, was concurred in by Justices Evans, Preston, and DeGraff.

Under the record in this case, for the purpose of appeal, it must be accepted as a fact that the jury could have found, under testimony warranting the finding, that the statutory crossing signals were not given by the appellees. The trial court did not pass upon this ground of the motion to direct. Common sense, common experience, and many decisions of this court note that the failure to give such signals is a most important factor to consider in passing upon the issue of contributory negligence. But the majority opinion ignores it by not even mentioning it.

The appellant had a right to assume that they would be given, and to conduct himself accordingly. He was not required to anticipate such negligence on the part of the appellees. The statute requires the giving of such signals so as to give a direct

warning to the traveler. The failure to give them is particularly negligent at dangerous crossings where the train's approach cannot be seen until 45 feet from the crossing. Whether they are given or not has a most important bearing upon the issue of plaintiff's contributory negligence. In Haven v. Chicago, M. & St. P. R. Co., supra, 188 Iowa 1266, 1269, 175 N. W. 587, 589, we said:

*"The jury could find freedom from negligence, because there was such right to rely."*

In McKern v. Wabash R. Co., supra, 195 Iowa 410, 413, 192 N. W. 152, 153, we said that the failure to give the signals *"is ordinarily sufficient to take the issue to the jury."* (Italics supplied.)

There is nothing in this case which takes it out of the ordinary. The following cases fully support the appellant's contention that the failure to give the signals, which fact the jury could have found, was of such direct and important bearing upon the issue of his negligence that it should have been submitted to the jury. Coonley v. Lowden, supra, 234 Iowa 731, 736, 12 N. W. 2d 870, 874, 875; Swegle v. Chicago, B. & Q. R. Co., supra, 196 Iowa 413-427, 192 N. W. 894; Smith v. Spirek, 196 Iowa 1328-1333, 195 N. W. 736; McKern v. Wabash R. Co., supra, 195 Iowa 410, 413, 192 N. W. 152; Johnson v. Omaha & Council Bluffs St. R. Co., supra, 194 Iowa 1230, 1234, 190 N. W. 977; Corbett v. Hines, supra, 194 Iowa 1344, 1349, 191 N. W. 179; Butterfield v. Chicago, R. I. & P. R. Co., supra, 193 Iowa 323, 328, 185 N. W. 151; Barrett v. Chicago, M. & St. P. R. Co., supra, 190 Iowa 509, 515, 526, 175 N. W. 950, 180 N. W. 670; Burnett v. Chicago, M. & St. P. R. Co., 172 Iowa 704, 714, 154 N. W. 919; Schulte v. Chicago, M. & St. P. R. Co., supra, 114 Iowa 89-95, 86 N. W. 63; Harper v. Barnard, supra, 99 Iowa 159, 161, 162, 68 N. W. 599; Hawkins v. Interurban R. Co., supra, 184 Iowa 232-242, 168 N. W. 234; Brose v. Chicago G. W. R. Co., 185 Iowa 867, 871, 171 N. W. 149; Haven v. Chicago, M. & St. P. R. Co., supra, 188 Iowa 1266, 1269, 175 N. W. 587; Carlson v. Meusberger, 200 Iowa 65, 71, 204 N. W. 432; Nederhiser v. Chicago, R. I. & P. R. Co., supra, 202 Iowa 285, 291, 208 N. W. 856; Rastede v. Chicago, St. P.,

M. & O. R. Co., 203 Iowa 430, 437, 438, 212 N. W. 751; Bang-
hart v. Meredith, 229 Iowa 608, 611, 612, 294 N. W. 918; Rhine-
hart v. Shambaugh, 230 Iowa 788, 791, 298 N. W. 876; Gray v.
Chicago, R. I. & P. R. Co., supra, 160 Iowa 1, 12, 13, 139 N. W.
934; Wilson v. Chicago, M. & St. P. R. Co., 161 Iowa 191, 205,
142 N. W. 54; Platter v. Minneapolis & St. L. R. Co., 162 Iowa
142, 158, 143 N. W. 992; Dusold v. Chicago G. W. R. Co., supra,
162 Iowa 441, 448–450, 142 N. W. 213; Davitt v. Chicago G.
W. R. Co., supra, 164 Iowa 216, 222, 145 N. W. 483; Hartman
v. Chicago G. W. R. Co., supra, 132 Iowa 582, 585, 586, 110
N. W. 10; Bruggeman v. Illinois Cent. R. Co., supra, 147 Iowa
187, 201, 123 N. W. 1007, Ann. Cas. 1912B, 876.

In Davitt v. Chicago G. W. R. Co., supra, 164 Iowa 216,
221, 223, 145 N. W. 483, 485, the court said:

"We think it may be fairly concluded from all the evidence
that had the driver of the team been constantly on the lookout,
the approaching train would have been discovered * * *. *But
this is not the sole test. He had the right to expect a compliance
with the custom of giving signals at that crossing, and if he
listened and heard nothing there was presented a question for
the jury to determine whether he was at the time exercising due
care.*" (Citing cases. Italics supplied.)

This matter was passed upon in Coonley v. Lowden, supra,
234 Iowa 731, 737, 12 N. W. 2d 870, 875, where the court,
speaking through Justice Garfield, said:

"We have repeatedly held that it is difficult to divorce
the reciprocal duties of railroad and traveler and it is proper to
consider, on the issue of contributory negligence, the right of
the traveler to rely upon the railroad's compliance with the law.
This is especially true of requirements designed to warn the
traveler of the train's approach. True, the failure to signal
does not relieve the traveler from exercising ordinary care on
his part. But the absence of a warning signal may have the
effect of lulling the mind into a sense of security. The testimony
that no signal was given is therefore properly to be con-
sidered on the question of contributory negligence. See author-
ities in preceding paragraph; also, [citing authorities]."

The facts are important factors in this appeal and I wish to give some additional consideration to them, keeping in mind that the rule that in passing upon defendant's motion to direct a verdict the evidence must be viewed in the light most favorable to plaintiff should be given more than mere lip service.

"Every inference reasonably permissible in support of the issue should be carried to the aid of the evidence." Bauer v. Reavell, 219 Iowa 1212, 1219, 260 N. W. 39, 43. See, also, McWilliams v. Beck, supra, 220 Iowa 906, 909, 262 N. W. 781.

"In determining this case, plaintiff's evidence must be viewed in its most favorable light, and the evidence most favorable to the plaintiff must be accepted. It is not for this court to weigh the evidence if it is in conflict." Deiling v. Des Moines R. Co., 217 Iowa 687, 689, 251 N. W. 622, 624.

As stated in Ney v. Eastern Iowa Tel. Co., 162 Iowa 525, 530, 144 N. W. 383, 385:

"* * * we must not overlook the rule, which has been established by a long line of decisions in this court, that, before the court is warranted in directing a verdict upon any issue tendered, every fact favorable to the party against whom the verdict is asked, and which the evidence tended to prove, must be conceded as established."

I have inserted herein appellees' Exhibit No. 4, a photograph showing the obstructions to appellant's eastward view just as he approached the crossing from the south.

The camera was placed 200 feet south of the track, in the center of the highway, so that the trees and buildings obstructing the view farther south are not shown. It was a four-rod highway with the center 22 feet graveled. As you look at the picture you are looking north. The cross-buck railroad sign to the right as you look at the picture was about 10 feet east of the graveled roadway and 31 feet south of the main-line track. The cross buck on the opposite side of the highway is north of the railroad tracks. The house and buildings in the right background are not the Weaver buildings, but are north of the tracks. The two poles with crossarms are in the high-tension electric line which runs north and south on the east side of the highway. The pole in the foreground, with the anchor pole attached, is about 10 feet from the gravel and about 17 feet due south of the cross-buck railroad sign, and about 8 feet west of the corner post of the right-of-way fence and the north-and-south fence of the Weaver yard. Appellees' plat, Exhibit No. 3, incorrectly locates this pole right up against the corner post. That plat does not locate many of the obstructions to appellant's east view. This high-line pole is about 48 feet south of the south rail of the main track. The anchor pole is attached to the high-line pole about 7 or 8 feet from the ground. Their bases were about 4 or 5 feet apart and 4 or 5 feet up they were about a foot apart.

Twenty feet east of the corner post and up against the right-of-way fence on the inside is a large cottonwood tree with a trunk 3 feet in diameter. Many of its branches are over the right of way. Lower limbs 2 or 3 feet above the fence extend at least 6 feet over the fence into the right of way. Another small tree between the cottonwood and the corner has branches 6 feet from the ground. A lilac bush is just east of the cottonwood tree. Weeds at least 2 feet high are in the right of way and the east 22 feet of the highway. The ground of the Weaver lot is 4 or 5 feet higher than the highway. The tops of the weeds would thus be 6 feet above the ground level of the graveled roadway, and appellant's head, on the left side

of the car, would not be over 5 feet above the road level, necessarily limiting his vision of even the top of a train approaching in the distance. His first obstruction and the one nearest him was the high-line pole and anchor pole. Sixty feet east of the highway and 34 feet south of the south rail of the main line was a telegraph pole, and anchor pole 10 feet north of it. He looked east as soon as he could see at all at the corner. He estimated he could see 75 or 100 feet to the east and saw no train. His speed was fifteen miles an hour—22 feet a second. He looked to the west, as prudence and our decisions require. Moore v. Chicago, St. P. & K. C. R. Co., supra, 102 Iowa 595, 600, 71 N. W. 569; High v. Waterloo, C. F. & N. R. Co., 195 Iowa 304, 310, 190 N. W. 331; Nederhiser v. Chicago R. I. & P. R. Co., supra, 202 Iowa 285, 289–291, 208 N. W. 856; Coonley v. Lowden, supra, 234 Iowa 731, 736, 12 N. W. 2d 870, 876; 3 Blashfield, Cyclopedia of Automobile Law and Practice, Perm. Ed., 138, section 1746. In Moore v. Chicago, St. P. & K. C. R. Co., supra, 102 Iowa 595, 599, 600, 71 N. W. 569, 570, in which a judgment on a directed verdict for defendant was reversed, the court said:

"He had no reason to expect an engine or train to pass from one direction more than from the other; *hence it was his duty to look in both directions.* He had a right to presume that no engine would be run at a greater speed than that prescribed in the ordinance, and that the bell would be rung at crossings as required. We have seen that, if plaintiff had looked west when about forty feet south of the crossing, he must surely have seen the approach of this engine, in time to have stopped and avoided the accident. The contention is that he was negligent in not again looking west after he passed the point sixty feet south of the track. We do not think it should be said, as a matter of law, that plaintiff was guilty of negligence in not again looking westward after he passed the point sixty feet south. He had looked westward at Shaw street, and from the sixty-foot point, and saw nothing approaching; was listening and heard nothing. *It was his duty to look east as well as west, and he did so.* While we do not say that the plaintiff was not negligent, we do not think that it should be said, as a

matter of law, that he was. Whether, in view of all the circumstances under which he acted, he was negligent, is a question about which we think men may honestly differ, and therefore one that should have been submitted to the jury." (Italics supplied.)

In Nederhiser v. Chicago, R. I. & P. R. Co., supra, 202 Iowa 285, 289–291, 208 N. W. 856, 858, the court said:

"In the selection of the time and place for making observations before going upon a railroad crossing, ordinary care must be exercised, *but it is ordinary care under all of the attendant circumstances.* The place selected must be such *that the observation will be reasonably effective.* A traveler on a highway, realizing that he is about to cross a railroad track, must look when by looking he can see, and listen when by listening he can hear. McFarland v. Illinois Cent. R. Co., 193 Iowa 776. It is for the jury, ordinarily, to determine whether a traveler about to go upon a crossing selected a proper place for making observation, and otherwise exercised ordinary care for his own safety. Case v. Chicago G. W. R. Co., 147 Iowa 747. It is impossible to affirm the precise number of feet from a crossing at which a traveler must look and listen. The looking should be within a reasonable distance before going upon the crossing, and the duty to look is a continuing duty. *We have held, however, that it is not negligence per se to fail to look at any particular point, and an instruction making it the duty of a traveler to look at all points in his passage has been condemned.* Winey v. Chicago, M. & St. P. R. Co., 92 Iowa 622. See, also, Davitt v. Chicago G. W. R. Co., 164 Iowa 216; Mitchell v. Union Terminal R. Co., 122 Iowa 237.

"*A traveler approaching a crossing is bound to look both ways, or up and down the tracks. This does not compel him to look in any particular direction first, and the frequency with which he should change the direction of his observation depends upon the circumstances, and usually presents a jury question.* If a greater danger is reasonably to be expected from one direction than from another, the traveler would be justified in paying more attention to that direction. * * * Furthermore, it is not for a court to say that some other course might have

been better and safer; *and this is especially true when a traveler is placed in a position of imminent peril by reason of the railroad company's negligence, as in failing to give proper signals.* That plaintiff would not have been struck by a train, had she acted differently than she did, does not conclusively show contributory negligence on her part. Wiese v. Chicago G. W. R. Co., 182 Iowa 508. \* \* \* *Plaintiff had the right to rely upon the presumption that the trainmen would perform their duties and sound their signals of warning in approaching the crossing,* and the jury in the present case could find that the warnings required by law to be given were not given by the engineer on his approach to the crossing. It is quite difficult, under the instant circumstances, to divorce the reciprocal duties of railroad and traveler. \* \* \* When the jury could find that plaintiff looked and listened when within a reasonable distance of the crossing, a court ordinarily will not attempt to say, as a matter of law, that the traveler is guilty of contributory negligence because he did not look and listen again from some other designated point from which he might possibly or probably have discovered the train. We are not dealing with perfect care and caution on the part of the plaintiff, but with whether, under all the attending circumstances, she exercised ordinary care to protect herself from injury." (Italics supplied.)

A judgment for plaintiff was affirmed.

In High v. Waterloo, C. F. & N. R. Co., supra, 195 Iowa 304, 306, 308, 310, 311, 190 N. W. 331, 334, the plaintiff was driving a pony attached to a spring wagon. The record shows that when he was 21 feet and 8 inches west of the west rail of defendant's track he looked southward, the direction from which the train came which struck him, and at that point could and did see a distance of approximately 150 feet; plaintiff said " 'it might have been 150 feet, and it might have been more, and might have been less.' " He neither saw nor heard the engine. He then turned and looked to the north, still continuing on his course, and then looked again to the south a second time and observed the defendant's engine within about 75 feet of the crossing. There was the usual conflict in the testimony about how far one could see along the track. Photographs and

plats were introduced. The court, speaking through Justice Faville, commented on the recognized fact that a railroad track is always a potential place of danger, and further, that one must use his senses at a railroad crossing, even in the absence of required signals. It said, at page 307 of 195 Iowa, page 333 of 190 N. W.:

"The true test *for every case* is whether or not, under all the existing circumstances, the person approaching a railway crossing, and about to cross, has exercised the degree of care and caution which a person of ordinary care and prudence would have exercised under the circumstances. Ordinarily, that question is *peculiarly one for a jury.* * * * *We are not disposed to adopt a hard and fast rule, and declare that a duty rests upon all persons approaching a railway track, even one where the view is partially obstructed, to invariably stop before attempting to effectuate a crossing.* * * * No one disputes the fact that, as the appellee [plaintiff] approached the railroad track from this point [21 feet 8 inches distant], he could see a greater distance south along the railroad track. * * * We do not think that the photographs offered in evidence demonstrate conclusively and certainly that the appellee *must* [italics by the writer of the opinion] have seen the approaching car when he looked to the south at the point where he testified that his observation was made. Having looked to the south at a point 21 feet and 8 inches from the rail, and having neither seen nor heard any approaching engine, the appellee then looked to the north, *as it was his duty to do.* He testified that thereafter he looked again to the south, and observed the approaching engine about 75 feet distant; and that at that time he was already upon the track. Must we say that, as a matter of law, the appellee was guilty of contributory negligence in failing to look to the south a second time sooner than he did, after having made his first observation in that direction? *It was as much the appellee's duty to look to the north as it was to look to the south. He was required to look and listen for an approaching train from each direction.* * * * *We think it was a question for the jury to determine, under these circumstances, whether the appellee acted as a man of ordinary care and prudence in making*

*this approach. If he looked to the south 21 feet and 8 inches from the track, and then looked to the north, it was a question for the jury to say whether he was negligent in not again looking to the south sooner than he did.*

"In this connection, *the fact must also not be overlooked that appellee contends that no warning signals were given by the approaching engine.* The appellee had a right to expect the appellant to obey the law in respect to such signals; and while the failure to give the same (if appellant did so fail) did not absolve the appellee from the duty of using reasonable care, it is a circumstance proper to be considered by the jury in determining whether appellee was guilty of negligence." (Italics supplied.)

Judgment for plaintiff was affirmed, Justices Evans, Stevens, and Arthur concurring.

In Barrett v. Chicago, M. & St. P. R. Co., supra, 190 Iowa 509, 515, 516, 175 N. W. 950, 180 N. W. 670, contributory negligence was held for the jury, in an opinion by Justice Ladd, concurred in by Justices Weaver, Evans, Preston, Stevens, and Arthur. The same question was reviewed at length in a supplemental opinion, with the same result except that Justice Salinger dissented. On pages 515 and 526 of 190 Iowa, page 953 of 175 N. W., page 671 of 180 N. W., the opinion states:

"Whether, notwithstanding that the track might have been clear to a distance of over 100 feet to the west, they were required to look again for an approaching train, was an issue for the jury to determine. * * * The law does not specify precisely what a person about to pass over a railroad crossing must do. The only test to be applied is that, in so doing, he must exercise ordinary care."

The opinion quoted with approval from Winey v. Chicago, M. & St. P. R. Co., supra, 92 Iowa 622, 625, 61 N. W. 218, 219, (Deemer, J.), the following:

"The rule no doubt is that if the traveler, having looked and listened without seeing or hearing an approaching train within *a reasonable distance of the crossing, is, by reason of a neglect of the railroad company to blow the 'statutory' whistle,*

*run upon and injured, liability attaches therefor;* and if the view of the track is obstructed by any means, so as to render it impossible or difficult to learn of the approach of a train, or there are complicating circumstances calculated to deceive or throw a person off his guard, then whether it is negligent on the part of the traveler who fails to look and listen is a question of fact for the jury to determine from the circumstances of each particular case. [Citing cases.] * * * but under any possible view of the. testimony it was error to require plaintiff to look constantly for trains 'at all points in his passage.' '' (Italics supplied.)

The opinion cited with approval like holdings from Platter v. Minneapolis & St. L. R. Co., supra, 162 Iowa. 142, 158, 143 N. W. 992; Brossard v. Chicago, M. & St. P. R. Co., supra, 167 Iowa 703, 149 N. W. 915; and Davitt v. Chicago G. W. R. Co., supra, 164 Iowa 216, 145 N. W. 483. In the last-cited case the driver looked at a point about 150 feet from the track, and again when 100 feet from the crossing, and said he did not see or hear the train. Had he looked at a distance of 50 feet, the jury might have found that he would have seen it, and, ''had he kept a continual outlook, he must have seen.'' The opinion herein states, at page 220 of 164 Iowa, page 484 of 145 N. W.:

''* * * on approaching the track from the one hundred and fourteen-foot point, the view to the north became wider, and when thirty-five to forty feet from the track one could see one hundred to one hundred and fifty feet into the cut.''

The plain inference being that when the plaintiff looked at the 100-foot point, the observable distance north along the track was less than 100 feet; and yet the court, in an opinion by Justice Withrow, concurred in by Justices Ladd, Deemer, and Gaynor, held that the issue of contributory negligence was for the jury and affirmed a judgment for the plaintiff.

Going back now to the facts in the case before the court, the appellant testified that as he looked again to the east after glancing to the west and seeing the man waving his arms he saw the train about 50 feet away. His car was then about on

the passing track which was 4 feet 8½ inches wide. The distance between the passing track and the main-line track was about 11½ feet. When he first looked east at the corner, 45 feet from the south rail of the main line, he was two seconds away from that rail, if he was traveling fifteen miles an hour. When he saw the train he was about one second away, at the speed he was traveling, and less than that when you consider the 4-foot overhang of the train.

As Justice Mitchell said, in Eby v. Sanford, 223 Iowa 805, 807, 273 N. W. 918, 919:

"We are dealing in fractions of seconds * * * The question is for the jury to decide * * *."

He slammed on his four-wheel brakes. They had been tested the Friday before. There was, of course, the "thinking distance"—the distance covered by your car from the moment your brain flashes "stop" until your muscles and nerves coordinate and you put your foot on the brake. He felt the brakes take hold and he thought he was going to stop in time. The pilot passed him but the cylinder head—the overhang of the engine beyond the south rail—caught the front of his car and threw the side of it into the eccentric rod of the engine. Where is the "manifest and flagrant want of care" of the "exceptional case" which the law requires to stamp his negligence as conclusive against him? Wherein was this negligence "so palpable" as to convince all reasonable minds? How can this be fairly called the "peculiar," the "rare," the "plain" case which deprives one of a jury trial, of an opportunity to have his lawyer argue to a jury the strength and the weakness of opposing contentions, and to point out the many discrepancies and contradictions in the testimony of the defendant? There are plenty of such in the testimony of the appellees. Lawyers and judges will agree that there is no more effective way to separate the false and the true. I am reminded of the words of the blind, immortal Milton found on page 96 of 2 Milton's Prose Works (1871 Edition):

"Though all the winds of doctrine were let loose to play upon the earth, so Truth be in the field, we do injuriously by licensing and prohibiting to misdoubt her strength. Let her

and falsehood grapple; who ever knew Truth put to the worse, in a free and open encounter?"

In what particular or in general did this young man's conduct greatly differ from that of the thousands of motorists who travel over roads unfamiliar to them? He was not looking at a place where he could not see at all, as in the Dean case [Dean v. Chicago, B. & Q. R. Co.], 211 Iowa 1347, 229 N. W. 223. He looked where he had the first opportunity, and could see 100 feet. Of course, he owed a continuous duty to exercise due care, but he was not under the duty of looking continuously to the east or in any other direction. The west side was the open side, but he knew that trains also approach from the open side, and prudently he glanced to the west. Was he negligent as a matter of law in not looking at all times to the east? After looking and listening 45 feet away and seeing no train and hearing no whistle or bell, was he, in the expressive words of the sound-thinking Justice Weaver, "to be conclusively chargeable with negligence because for an instant his eye was not exploring the distance for an *unheralded* danger"? (Italics supplied.) Butterfield v. Chicago, R. I. & P. R. Co., supra, 193 Iowa 323, 328, 185 N. W. 151, 153. Without a dissent, this court answered that he was not. Common "horse sense," common prudence, and common motor experience must approve the answer. I do not say that a jury might not find him contributorily negligent, but I am complaining and protesting that this court should say to him, and to all others in like situations, that a jury shall not be given the opportunity to pass upon the question.

He was not, *as a matter of law*, required to stop, nor to look at all times to the east. He was not, *as a matter of law*, required to so drive his car and so conduct himself as to avoid any collision. He was not the absolute insurer of his own safety. He had a right to expect the signals required by statute and common prudence, and to govern himself accordingly. The appellees owed him that duty, and, having lulled him into less vigilance, ought not escape its liability. His conduct was vastly different from that of the motorist in Hitchcock v. Iowa Southern Utilities Co., 233 Iowa 301, 6 N. W. 2d 29, who saw the

train 250 feet away and who approached an open crossing at such speed that he tire-marked the pavement for 187 feet. He used far greater care than Carlin in the Thomsen case [Carlin v. Thompson], 234 Iowa 469, 12 N. W. 2d 224. I dissented in that case. I had not so much quarrel with the result as with the reasoning and the law announced.

The facts in this case are much different from those in Nurnberg v. Joyce, 232 Iowa 1244, 7 N. W. 2d 786. Dean v. Chicago, B. & Q. R. Co., supra, 211 Iowa 1347, 299 N. W. 223, has little application. The plaintiff therein was "thoroughly familiar with all the conditions" at the crossing, which was a private one he had used "for a considerable period" in going to and from some land he was farming. He knew the crossing was so obstructed that he could not see and could not hear an approaching train, until his car was on, or nearly on, the tracks.

One of my colleagues, in his letter of concurrence, quoted from and cited other decisions which convinced him of the rightness of the majority opinion. I would like to analyze each of them but that cannot well be done. I am not in serious disagreement with the result or the law declared in any of them, with one or two exceptions which I will refer to later. The question was close in some of them. But, in general, they are not precedents or authorities which sustain or approve of the majority opinion. Fairness demands that I list these cases: Swanger v. Chicago, M. & St. P. R. Co., 132 Iowa 32, 109 N. W. 308; Wilson v. Illinois Cent. R. Co., 150 Iowa 33, 129 N. W. 340, 34 L. R. A., N. S., 687; Beemer v. Chicago, R. I. & P. R. Co., 181 Iowa 642, 644, 162 N. W. 43; Bussler v. Chicago, M. & St. P. R. Co., 165 Iowa 361, 145 N. W. 533; Yanaway v. Chicago, R. I. & P. R. Co., 195 Iowa 86, 190 N. W. 21; Brown v. McAdoo, 195 Iowa 286, 188 N. W. 7; Sackett v. Chicago G. W. R. Co., 187 Iowa 994, 999, 174 N. W. 658, 659 (in this case the plaintiff sat sideways on the rear seat of a motorcycle looking at all times directly opposite from the approach of the train. The opinion states: *"Under the record, plaintiff did nothing, and exercised no care * * *."*); Williams v. Chicago, M. & St. P. R. Co., 139 Iowa 552, 117 N. W. 956 (in this case, the plaintiff, a rural mail carrier, familiar with the crossing, knew the train was overdue, looked when he was 12 rods from the crossing

where a train could be seen at all times for 80 rods, and then began sorting his mail, without further looking or other pre-caution). In all of the cases just listed, by admission or un-disputed evidence, the injured person approached the crossing without looking. Bussler v. Chicago, M. & St. P. R. Co., supra, 165 Iowa 361, 145 N. W. 533 (plaintiff was standing between the rails looking *east* as the engine from train, just arrived, was being backed *east* to the roundhouse).

Continuing with list: Landis v. Interurban R. Co., 166 Iowa 20, 147 N. W. 318; Griffin v. Chicago, R. I. & P. R. Co., 68 Iowa 638, 27 N. W. 792; Hinken v. Iowa Cent. R. Co., 97 Iowa 603, 66 N. W. 882; Waters v. Chicago, M. & St. P. R. Co., 189 Iowa 1097, 178 N. W. 534; Moore v. Keokuk & W. R. Co., 89 Iowa 223, 56 N. W. 430; Bloomfield v. Burlington & W. R. Co., 74 Iowa 607, 38 N. W. 431; Sohl v. Chicago, R. I. & P. R. Co., 183 Iowa 616, 167 N. W. 529; Ballard v. Chicago, R. I. & P. R. Co., 193 Iowa 672, 185 N. W. 993; Anderson v. Dickinson, 187 Iowa 572, 174 N. W. 402; Reynolds v. Hines, 192 Iowa 530, 185 N. W. 30; Darden v. Chicago & N. W. R. Co., 213 Iowa 583, 239 N. W. 531. In none of these cases are the facts so fairly comparable to those in this case as to rightly rule the decision of the court. In a number of them the plaintiff was familiar with the crossing, or the train schedules, or he looked elsewhere than he should, the train was plainly in sight, or his view was open and obstructed for greater distances, and for longer ap-proaches than in this case. Rosenberg v. Des Moines R. Co., 213 Iowa 152, 159, 163, 238 N. W. 703, 707, 709, was also cited. There the plaintiff could see but 300 feet, according to his testimony. It was a private crossing on the grounds of the defendant. The plaintiff looked once only, and that when but 25½ feet from the track. He then started choking the car-buretor and shifting gears. He made no further observations. Four times Justice Kindig emphasizes the fact that plaintiff never listened, saying: "During this discussion, it is to be re-membered *that appellant does not claim to have listened at any time.*" He did not deny that the gong was not sounded. The court said: "During the interurban's approach to the crossing, the motorman constantly rang the bell * * *." Certainly; that decision is of no weight in this case.

Glessner v. Waterloo, C. F. & N. R. Co., 216 Iowa 850, 249 N. W. 138, is in the list and in the majority opinion. There the plaintiff last looked in the direction of the approaching interurban car when he was 110 feet distant from the crossing, with which he was very familiar. I do not complain of the result except that I think plaintiff should have received the benefit of the reasonable doubt and have been permitted to go to the jury. I disagree with the decision on another point, which I will discuss.

My colleague stated: "To make an observation when he could only see 100 feet of the track would, in my judgment, be no observation at all." I am quite sure there is no decision of this court which supports such a statement. It is very, very seldom that a court is justified in saying, *as a matter of law,* that the exercise of ordinary care imposes upon a person the absolute duty to do some particular thing. This court has repeatedly so held. In passing upon contributory negligence as a matter of law it is the over-all view which should be determinative, and not a single fact insulated from surrounding circumstances. Certainly this court never has, and never should, set in figures the distance one must see down a railroad track before looking up the track. We must take as the guide the sound and time-honored one—*What distance was reasonable under the circumstances?* The situation must very rarely, if ever, arise when any court should say, as a matter of law, that 50, 75, 100, 150, or 200 feet is "no observation at all." Whether the distance observable was reasonable should be for the jury and not the court. In Nederhiser v. Chicago, R. I. & P. R. Co., supra, 202 Iowa 285, 289, 208 N. W. 856, 858, the court said: "The place selected must be such that the observation will be *reasonably effective.*" (Italics supplied.) As said by Justice Ladd, in Barrett v. Chicago, M. & St. P. R. Co., supra, 190 Iowa 509, 526, 180 N. W. 670, 671: "The law does not specify *precisely* what a person about to pass over a railroad crossing must do." (Italics supplied.) In Rosenberg v. Des Moines R. Co., supra, 213 Iowa 152, 238 N. W. 703, the seeing distance was 300 feet, but the decision is not bottomed on that fact alone, by any means.

In High v. Waterloo, C. F. & N. R. Co., supra, 195 Iowa 304, 308, 190 N. W. 331, 334, the plaintiff said the approximate distance he could and did see " 'might have been 150 feet, and it might have been more, and might have been less.' " But this court did not say it was "no observation at all."

In Davitt v. Chicago G. W. R. Co., supra, 164 Iowa 216, 220, 145 N. W. 483, the observable distance it may fairly be said was less than 100 feet, and this court said the question was for the jury.

In this case the appellant was especially careful and cautious. He started out that morning with his car in good condition, with new tires, lately tested brakes, running quietly and smoothly. His mind was on his driving and his surroundings. He did more than the law requires. He looked continuously, ahead and to each side, but mostly to the more obstructed side. He was vigilant with all of his senses. 'He had the car windows down and he listened for the train and the expected signals. He had the car under control and traveling at a very moderate speed. He permitted nothing to distract his attention. He was looking east when he came to the right-of-way line, the first place where a view in that direction was possible. Obstructions obscured the view in the distance, but he could see the track for 100 feet and saw no train. Should he have continued to look east until he had a more extended view? That is the question. The majority say that he was conclusively negligent in not doing so. Looking back, we can now say that it would have been better had he done so. But he was not gifted with prescience. Yet the majority say that he did not use such sense as he was endowed with, and that he acted unreasonably, with palpably manifest and flagrant negligence, as a matter of law, and to the extent that all reasonable and fair-minded men honestly seeking for the truth must so conclude. I cannot agree with such a conclusion. This young man could see for a distance of 100 feet, and no train was in sight. So far as he could see, no train was coming from the east. He could see none and he could hear none. He reasonably presumed, and rightly so, that the whistle on any engine within 60 rods would have been sounded and the bell rung continuously until the crossing was

passed. He heard neither. Certainly it ought not be said that he was negligent as a matter of law in looking to the west, as common prudence and our decisions say it was his duty to do. An act cannot be negligence as a matter of law which the law requires. His car was slowly moving forward and without delay he looked again to the east and saw the train about 50 feet away. Prompt application of the brakes stopped the car, as he believed, south of the track. But it was within the overhang of the train.

Two things he could have done and saved himself. He could have continued to look east. His failure to do this was not per se negligence. He could have stopped his car between the right of way and the track. But assuredly it cannot be said that the circumstances demanded this as a matter of law.

Two witnesses for appellant testified to the obstruction of the view eastward until within about 25 or 30 feet of the track. The appellees' civil engineer made the plat, Exhibit No. 3, and its claim agent took the picture exhibits. Photographs, just as witnesses, do not always tell the truth. None of the east views show the high-line pole and brace pole, although they were directly west of the fence corner post. None of them were taken from the place where the appellant said he first looked east—near the corner post on the right-hand side of the gravel east of the center of the highway. Exhibit 6 was taken with the camera in the center of the road. Exhibits 7 and 8 were taken from the west edge of the gravel, where it is conceded a more extensive view would present itself to the eye of the camera. The second telegraph pole showing in Exhibits 7 and 8 is about 160 feet from the center of the highway. The first is about 60 feet. The camera was 3½ feet high. The appellant's eyes were about 5 feet high. We cannot accept these exhibits as true any more than we can accept the testimony of appellees' witnesses as true. Whether the location and position of the camera were such as to faithfully reproduce the surroundings as they appeared to the appellant were questions of fact, and for the jury's determination. See per curiam opinion in Hawkins v. Interurban R. Co., supra, 184 Iowa 232, 240, 168 N. W. 234.

Some of appellees' nonemployee witnesses corroborate the appellant. Kirchbaum testified that around about 50 feet

south of the track—the center, I believe—the poles and the trees merge together "so your view is completely cut off." Mimbach said that at about 50 feet south *of the center of* the track, where Exhibit No. 8 was taken, at the west edge of the gravel, he made some observations. On cross-examination he testified that if you stepped back a couple of feet and to the right a couple of feet you could not see very far down the track—about 125 feet, according to his best judgment. The jury could find that the appellant first looked from about this location.

There is also support for appellant's testimony that no train was in sight when he looked and saw about 100 feet to the east. Appellees' fireman sat on the left side of the engine. The following is from his cross-examination:

"When he saw the car some two hundred or two hundred fifty feet south, the train was eight hundred feet east of the crossing, maybe a little less, maybe a little more. His best judgment is eight hundred feet. He saw the car when it first came out from behind the obstruction [at the Weaver corner]. It was traveling about fifteen miles an hour. The train then was close to the crossing, 'probably fifty—between fifty and seventy feet, maybe.' It might have been a little further. Doesn't think it was one hundred feet. * * * He saw the car come in contact with the locomotive. He didn't see the car diminish its speed."

Even the majority of the court cannot wipe that testimony out. It should have gone to the jury.

The car was 200 feet south of the track when he first saw it and was traveling fifteen miles an hour, and the train was 800 feet east of the crossing, or four times the distance from it that the car was. Since the engine and the car reached the center of the crossing at the same time, the speed of the train was sixty miles an hour. Appellant was about 45 feet from the track when he looked east and saw 100 feet, and the engine was four times 45 feet, or 180 feet down the track and out of sight.

If you take the fireman's other estimate, that the train was 50 feet away and the car was at the Weaver corner, approximately 50 feet distant, the train had traveled 750 feet

while the car had traveled 150, and the speed of the train must have been five times fifteen miles, or seventy-five miles an hour, and was five times 45 feet, or 225 feet away when the appellant first looked.

The appellant is entitled to have the court view the testimony, particularly the appellees', in the most favorable aspect.

The engineer said the crossing whistle was four blasts—two long, a short, and a long—and it consumed ten seconds. He blew the signal twice, commencing 1,400 feet east of the crossing, and the train traveled 700 feet during the first signal. And he and the fireman and the head brakeman, with marvelously precise and accurate memories, considering their other duties, testified that the engine was in the middle of the crossing when the second long blast of the second signal was sounding. The Iowa Reports confirm the splendid memories which trainmen have for crossing signals in collision cases, but they have never recorded such a feat as this.

Seventy feet a second would be about forty-seven miles an hour. The rear brakeman was not a witness but the other four trainmen put the train speed at twenty-five or thirty miles an hour as it approached the crossing.

It is ordinarily the province of the jury to pass upon the veracity of witnesses, and the credibility, weight, and probative value of the testimony.

I take exception, as unsound law, to the statement in the majority opinion, to wit:

"There is no evidence of any diverting circumstances or deceptive appearances excusing him from the duty of looking at a place where he could see *and from having his car under control so as to be able to stop if he then discovered the approach of a train.*"

It is the italicized portion of which I complain. The authority for the statement is the italicized portion in the quotation from Glessner v. Waterloo, C. F. & N. R. Co., supra, 216 Iowa 850, 853, 249 N. W. 138, 139, as follows:

"The law does not undertake to direct whether a traveler upon the highway shall first look to the right or to the left be-

fore crossing tracks, or to fix the place where observation shall be made. It does require that the traveler shall look at a place where he can see, *and that he shall then be in a situation to avoid injury by the operation of cars upon the tracks."* (Italics supplied.)

No authority in support of the italicized statement is cited in the Glessner case. In Carlin v. Thompson, supra, 234 Iowa 469, 477, 12 N. W. 2d 224, 228, is a supporting statement as follows:

"It is sufficient to say that the plaintiff, coming from behind known and clearly visible obstructions nearly 300 feet from the crossing, should be held to the rule that an ordinarily prudent person would have his car under such control that if he then discovered danger of collision he would be able to stop in time to avert that danger."

I challenged the soundness of the statement with supporting authorities in my dissent in that case.

The majority opinion placed upon the appellant not only the duty of exercising ordinary care under the circumstances but also imposed upon him the absolute duty of having his car under such control as to enable him to stop if necessary to avoid collision. The happening of the collision is taken as conclusive evidence of such lack of control, and from it it is reasoned that appellant was guilty of contributory negligence as a matter of law.

The proposition asserted in the majority opinion was rejected by this court in McKern v. Wabash R. Co., supra, 195 Iowa 410, 414, 192 N. W. 152, the quotation therefrom in point being set out in this dissent. The same proposition was rejected in Dombrenos v. Chicago, R. I. & P. R. Co., 194 Iowa 1161, 1164, 1167, 1168, 1177, 1178, 191 N. W. 158, 159, 161, 164, 165, thus:

"The appellee * * * plants its justification of the directed verdict on the single proposition that plaintiff must be held chargeable with contributory negligence *as a matter of law,* because he did not have the movement of his car under such control that he *could* have stopped it in time to avoid the collision after he discovered the approach of the train. * * * If this be true,

the road to an affirmance of the trial court's ruling is easy. But the proposition so advanced is certainly not the law. * * * Appellee argues with much earnestness that, as a matter of law, reasonable care required plaintiff to have such control of his car as would enable him to stop it, no matter what the circumstances might be, and without any reference to the reckless and unlawful operation of the train. * * * It would seem that this question has been decided otherwise so often that the arraying of authorities thereon might well be regarded unnecessary; but that we may not seem to ignore the appellee's position, we extend this opinion for a recurrence to some of the rules and principles which have characterized the law of negligence since the time 'whence the memory of man runneth not to the contrary.' * * * It is not within the province of this court to establish a rule by which any specific act or omission shall constitute negligence as a matter of law, without any consideration of the circumstances attending and surrounding it. * * * If we proclaim the rule that every driver approaching a crossing must stop his car, or have it under such control that he can stop it in time to avoid a collision, at the peril of being held negligent as a matter of law, without consideration of the circumstances which have led him into the place of danger, he will thereby be compelled to become his own insurer in every case of collision, without regard to the company's negligence, or to other modifying circumstances; and the statutes and ordinances and rules of the common law, intended for his protection, will be rendered wholly nugatory."

From the concurring opinion of Stevens, J., in the Dombrenos case, at page 1179 of 194 Iowa, page 165 of 191 N. W.:

"He was not bound to drive at such a rate of speed, when approaching the crossing, or to have his car under such control, as to preclude the possibility of a collision."

In Butterfield v. Chicago, R. I. & P. R. Co., supra, 193 Iowa 323, 328, 185 N. W. 151, 154, the court held, without dissent:

"The arguments urged by counsel have but one logical conclusion, and that is that a person using a public railway crossing must assume all the risk of its negligent or reckless misuse by

the company, if by any possible measure of caution the danger can be discovered and avoided. That such is not the law is too manifest for discussion. It may be, as counsel say, that 'times have changed,' but no change of time or circumstance can justify the judicial repudiation of a fundamentally sound principle of law or justice.''

Under repeated decisions of our court, if the case at bar had been submitted to the jury under instructions embodying this rule of the majority opinion they would have constituted reversible error. I set them out and quoted from them in my dissent in Carlin v. Thompson, supra, 234 Iowa 469, 485 et seq., 12 N. W. 2d 232, 233, and I will simply cite them here: Gregory v. Suhr, 221 Iowa 1283, 1285–1292, 268 N. W. 14, 15; Knutson v. Lurie, 217 Iowa 192, 203–205, 251 N. W. 147, 153; Looney v. Parker, 210 Iowa 85, 90, 230 N. W. 570, 572; Jarvis v. Stone, 216 Iowa 27, 34, 247 N. W. 393, 396; Faatz v. Sullivan, 199 Iowa 875, 882, 883, 200 N. W. 321.

Unless we are to repudiate these holdings of the court, appellant was under no absolute duty to have his car under such control as to enable him to avoid a collision. If this theory of law is applicable in railroad-crossing cases, and the court is to be logical and consistent, it should apply to all negligence cases. We should hold that a plaintiff who is approaching a highway intersection is bound not only to exercise ordinary care under the circumstances but that he must have his car under such control as to avoid, at his peril, collision with other vehicles. If a collision occurs, he has not exercised control, and is guilty of contributory negligence as a matter of law. A like rule would necessarily follow as applied to other plaintiffs in negligence cases.

With the majority opinion as a guide respecting contributory negligence in railroad-crossing cases, no other conclusion can be logically reached, where the no-eyewitness rule is not available, but that the traveler must at his peril avoid colliding with a train. There is no logical stopping place short of such a result. That is not ordinary care. It is extraordinary care imposed not by a fact-finding body but by the court as a matter of law.

This theory, in effect, applies the assured-clear-distance rule to travelers in railroad-crossing cases. The traveler is required as a matter of law to stop in time to avoid colliding with a train that may appear suddenly in front of him, even though the statutory signals were not given. And in the application of this harsh rule the majority, in effect, deny to the traveler the right to assume that the railroad will give the warning signals which the legislature has required it to give for the benefit of the traveler. Such right of assumption which the majority opinion ignores is now recognized in the assured-clear-distance statute (section 5023.01, Code, 1939), as well as in several decisions of this court. See Central States Elec. Co. v. McVay, 232 Iowa 469, 5 N. W. 2d 817; Uhlenhopp v. Steege, 233 Iowa 368, 7 N. W. 2d 195; Harrington v. Fortman, 233 Iowa 92, 8 N. W. 2d 713; Semler v. Oertwig, 234 Iowa 233, 255, 12 N. W. 2d 265, 276.

If the appellant had been approaching an intersecting highway instead of a railroad crossing, and had collided with a motor vehicle instead of a train, other conditions being the same, no member of this court would seriously suggest that he was contributorily negligent as a matter of law. See Holden v. Hanner, 231 Iowa 468, 1 N. W. 2d 671.

The case for appellant here is much stronger than was plaintiff's case in our last pronouncement on this question, Coonley v. Lowden, supra, decided February 8, 1944, 234 Iowa 731, 12 N. W. 2d 870, in which a majority of this court (Oliver, Wennerstrum, Mulroney, Garfield, JJ., and the writer) held contributory negligence was for the jury.

1. Here appellant was a stranger to the crossing and to the vicinity. In the Coonley case, plaintiff lived a little over a block from the crossing and was familiar with it.

2. The view of the crossing here was much more effectively obstructed than in the Coonley case. There it was a controverted matter whether the view was obstructed. Here it is conceded, as is apparent from the following answer of the railroad's assistant engineer to a question by the railroad's attorney:

"Q. Mr. Bost, it is fair to say, is it not, to the jury, that this highway, south of the main line track, as you proceed north

upon it to the track, is substantially obstructed, so far as the view of approaching trains is concerned, up to within fifty feet of the main line track? A. Yes, sir, along the farmstead—along the Weaver farmstead." (Other witnesses put this distance at less than 50 feet.)

3. Appellant here clearly exercised more care than did plaintiff in the Coonley case in looking and listening for a train, and especially, in operating his car in an attempt to avoid a collision. Here three witnesses, Mrs. Krieps, Anderson, and appellant himself, testified both on direct and cross-examination the car was brought to a complete stop before the rocker arm of the engine struck it. In the Coonley case plaintiff's car neither stopped nor changed its course. Here appellant came very close to avoiding injury. Because he did not succeed, the majority holds he was guilty of contributory negligence as a matter of law.

It is apparent from reading the majority opinion and the dissenting opinion of Justice Smith in the Coonley case and the majority opinion herein that the underlying theory of the Coonley dissent has now become the view of the majority of this court. Why the majority here repudiates the majority opinion in the Coonley case and adopts the philosophy of Justice Smith's dissent in that case, by indirection, without even a mention of the Coonley case, is hard to understand. That case should either be followed, distinguished, or directly repudiated.

This dissent has reached a wearisome length. Principles of law long considered fundamental in cases of this kind have been dwelt upon because the majority opinion has disregarded them. I have thought it timely to discuss them at length and to call to mind the Scriptural injunction to "Remove not the ancient landmark, Which thy fathers have set."

I would reverse.

OLIVER, GARFIELD, and MULRONEY, JJ., join in this dissent.